1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - - - X
 3
    UNITED STATES OF AMERICA,      : 97-cr-01005 - PKC
 4                                 :
                                   :
 5                                 :
         -against-                 : United States Courthouse
 6                                 : Brooklyn, New York
                                   :
 7                                 :
                                   : Tuesday, April 23, 2024
 8  JOHN PAPPA,                    : 10:00 a.m.
                                   :
 9          Defendant.            :
                                   :
10  - - - - - - - - - - - - - - - - X

11       TRANSCRIPT OF CRIMINAL CAUSE FOR ORAL ARGUMENT
            BEFORE THE HONORABLE PAMELA K. CHEN
12               UNITED STATES DISTRICT JUDGE

13              A P P E A R A N C E S :

14  For the Government: BREON S. PEACE, ESQ.
                        United States Attorney
15                      Eastern District of New York
                        271 Cadman Plaza East
16                      Brooklyn, New York 11201
                    BY: RAFFAELA BELIZAIRE, ESQ.
17                      Assistant United States Attorney

18  For the Defendant:  HOPWOOD & SINGHAL PLLC
                        1701 Pennsylvania Avenue, NW
19                      Suite 200
                        Washington, D.C. 20006
20                  BY: SHON HOPWOOD, ESQ.
                        KYLE SINGHAL, ESQ.
21

22  Court Reporter:  Nicole J. Sesta, RMR, CRR, RPR
                     Official Court Reporter
23                   E-mail:  NSestaRMR@gmail.com

24  Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.
25
```

*Proceedings*                                                    2

1          THE COURTROOM DEPUTY:  Criminal cause for oral

2    argument, United States versus Pappa, docket number

3    97-cr-1005.  Will the parties please state their appearances

4    for the record, starting with the government.

5          MS. BELIZAIRE:  Good morning, Your Honor.

6          Raffaela Belizaire for the government.  Also at

7    counsel table with me is Special Agent Joseph Costello.

8          THE COURT:  Good morning to both of you.

9          MR. HOPWOOD:  Good morning, Your Honor.

10         Shon Hopwood and my colleague, Kyle Singhal, on

11   behalf of John Pappa.

12         THE COURT:  I'm sorry.  What was your colleague's

13   name?

14         MR. HOPWOOD:  Kyle Singhal.

15         THE COURT:  Good morning to all of you.  You may

16   remain seated during this proceeding so that you can use the

17   microphones.

18         I just want to start off by making clear this is not

19   a formal resentencing hearing.  I am not going to sentence the

20   defendant today or at this proceeding.

21         The purpose of today's proceeding is to give the

22   parties an opportunity to be heard beyond their written

23   submissions.  I also want to give any victims or family

24   members of victims the opportunity to be heard, as well as the

25   defendant, if he wishes to be heard.

*Proceedings*                                                        3

1          Let me ask the government, I have received letters

2     from some family members of some of the victims.  Is there any

3     family member or any victim who wants to speak today?

4          MS. BELIZAIRE:  Yes, Your Honor.

5          There are three individuals who would like to

6     address the Court today regarding this motion.  The first of

7     them is Ms. Rosemary Sparacino, who is the mother of John

8     Sparacino; the cousin of John Sparacino; the cousin of John

9     Sparacino, Karen Bracco; and then the surviving intimate

10    partner of Rolando Rivera, Ms. Gedz, who would also like to

11    address the Court.

12         THE COURT:  That's G-E-D-Z; is that correct?

13         MS. BELIZAIRE:  Yes, Your Honor.

14         THE COURT:  How do you spell Bracco?

15         MS. BELIZAIRE:  B-R-A-C-C-O.

16         THE COURT:  Why don't we have those individuals

17    speak first in case they decide they don't want to stay for

18    the rest of this, and I don't want to detain them any longer

19    than necessary.  Obviously they have the right to stay as long

20    as they want.  Is there an order of people who want to speak?

21         MS. BELIZAIRE:  Why don't we first call Ms. Rosemary

22    Sparacino.

23         THE COURT:  Ms. Sparacino, if you would come

24    forward.  This might be a little awkward but if you're all

25    right standing here at this podium, I think that might be the

*Proceedings*                                                    4

1    best.

2            Do you need to have a seat or is standing okay?

3    You can sit, if you like.  Maybe sit next to the agent over

4    there and use the microphone.  It might be a little less

5    awkward.

6            I know this is a little uncomfortable, but I'm going

7    to have you first state your full name for the record, and

8    then pull the microphone as close to you as possible.

9            MS. SPARACINO:  Rosemary Sparacino.

10           THE COURT:  Good morning, Ms. Sparacino.

11           MS. SPARACINO:  Good morning, Your Honor.

12           My eldest son was 24 years old when he was executed.

13   The defendant savagely mutilated his body and placed him in a

14   car, which he then set on fire.  Such depraved indifference to

15   human life shouldn't be rewarded with an early release.  My

16   family has received and will continue to endure life sentences

17   without any chance of reprieve from this endless grief and

18   senseless loss.

19           My grandchildren will never have an uncle.  My

20   youngest son will never have his brother back, and my heart

21   and mind have never been -- have been irrevocably damaged by

22   the defendant's cruel and barbaric actions.  The defendant sat

23   at my table on many occasions and was treated as a family

24   member.

25           He actually looked me straight in the eye and

*Proceedings*                                                          5

1    expressed concern and confusion about my son's disappearance

2    knowing full well the atrocities he committed; the location of

3    his mutilated body.

4         Having received the sentence of life plus 45 years

5    with no chance of parole, the defense is now seeking early

6    release as an opportunity to reenter society.  My son has no

7    option.

8         The defendant's release would impact the entire

9    family.  My peace of mind would be shattered knowing that he

10   was back in society and in the position to potentially

11   threaten, hurt, and maim my only living son and grandchildren.

12   I implore you to put a stop to this for early release.  I ask

13   that you put yourself in my shoes only for a moment.  If the

14   defendant did your son or daughter what he did to mine, would

15   you be inclined to set him free?  I hate you.

16        THE COURT:  Thank you very much, Ms. Sparacino.  I

17   am truly sorry for your loss.

18        MS. BRACCO:  Good morning, Your Honor.

19        THE COURT:  Please state your name for the record.

20        MS. BRACCO:  My name is Karen Bracco, and John

21   Sparacino was my cousin.  I am writing to implore you to keep

22   this murderer in prison.  The man who murdered my cousin was

23   charming and personable.  He was also devious and cunning.  He

24   used these traits to keep himself close to my Aunt Rose and my

25   cousin, Sal, knowing full well the atrocity he had committed.

1            While our family searched for my cousin, John, his

2    killer was in my aunt's house pretending to aid the search.

3    When his body was found in a horrific state, his killer

4    remained close to my cousin, Sal, never showing a moment of

5    guilt or remorse over what he had done, only caring if any

6    suspicion was on him.  He sat at my aunt's table knowing the

7    vicious and brutal way that he had killed her son.

8            He looked in her face and never showed a glimmer of

9    conscience for what he had done.  I suppose he used these

10   traits to make somebody believe that he deserves leniency.

11   But then that's what a sociopath would be good at doing,

12   convincing people that they're someone that they're not so

13   they can carry out some depraved agenda.

14           In the three decades since John was murdered, it's

15   hard to remember him separate from the circumstances of his

16   death.  I am haunted by the details of what so inhumanely was

17   done to him.  I force myself to remember the softness of his

18   face, how incredibly blue his eyes were, or the slight lisp in

19   his voice that always reminded me of the little boy he once

20   was.

21           John could tell a story that would make you laugh

22   harder than anyone.  A simple trip to the grocery store would

23   generate a story that would have you in tears.  He was funny

24   and he was loving.  He was loved by his cousins, aunts, and

25   uncles, and adored by his mother and his brother.

*Proceedings*                                                    7

1          His life has value and meaning and I miss him

2    terribly.  The day John was brutally murdered, his family

3    received a life sentence that we will never get any relief

4    from.  There's not a second chance for John.  After 30 years,

5    there will be no trips to Disney, walks on the beaches, he'll

6    never be able to share another holiday with us, dance at his

7    nephew's wedding.  He will not be there to hold his mother's

8    hand when she's ill.

9          THE COURT:  I need you to go a little slower because

10   we have a court reporter.

11         MS. BRACCO:  I'm sorry.

12         THE COURT:  It's okay.  Can you back up and, I

13   apologize, you say after 30 years there will be no trips.

14         MS. BRACCO:  There will be no trips to Disney for

15   him or walks on the beach.  He will never be able to share

16   another holiday with us, dance at his nephew's wedding.  He

17   will not be there to hold his mother's hand when she is ill.

18         He will never experience the countless hopes and

19   dreams we had for him.  One person is responsible for the

20   everlasting grief John's family suffers.  To give this man a

21   second chance is to allow a vicious and brutal murderer back

22   into society.  To give him the opportunity to experience all

23   that he robbed John and his family of is undeserved.  I also

24   sincerely fear for the lives of my aunt and cousin, as this

25   person is without conscience or remorse.

*Proceedings*                                                          8

1          Neither of them deserves to live out the remainder

2   of their lives wondering if they will run into him somewhere,

3   or worse yet if he will seek retribution on them or their

4   families.  I implore you to keep this murderer where he is, to

5   spend the remainder of his days praying for the savage and

6   brutal thing that he did.  Please don't be fooled by him as we

7   were.  I'm begging for justice for my cousin, John, and peace

8   of mind for my aunt and my cousin.  Thank you.

9          THE COURT:  Thank you very much.  I'll hear now from

10  Ms. Gedz.

11         MS. BELIZAIRE:  Yes, Your Honor.  She's in the

12  hallway and will be coming in in just a moment.

13         THE COURT:  All right.  Ms. Gedz, if you'll come up

14  here to the table where the prosecutor is sitting.  You can

15  have a seat there in the back, and I want you to be sure to

16  use the microphone.  And if you'll start off by stating your

17  name for the record.

18         MS. GEDZ:  My name is Michele Gedz.

19         THE COURT:  And that's G-E-D-Z, right?

20         MS. GEDZ:  G-E-D-Z.

21         THE COURT:  And common spelling of Michele?

22         MS. GEDZ:  M-I-C-H-E-L-E.

23         THE COURT:  You can make whatever statement you

24  want.  Just bear in mind, we have a court reporter who is

25  transcribing everything.  So just go slowly and take your

*Proceedings*                                                                9

1    time.  You may proceed.

2              MS. GEDZ:  So I was going to come prepared and have

3    everything written down, and I said, I'm going to wing it,

4    just like what was thrown at me.  So I'm going to do the best

5    that I can.

6              THE COURT:  Take your time.

7              MS. GEDZ:  I was five months pregnant starting a

8    life, expecting to have a life with someone that was my

9    soulmate, the love of my life.  Okay.

10             I had a child that never got to see, smell, hear,

11   feel the love of the real father.  Okay.  My life was taken on

12   that day, June 8, 1994.  Okay.  My life was taken.  I was

13   never the same and I'll never be the same.

14             Ripped from my life, taken out like trash, thrown on

15   a highway, like garbage.  Okay.  Here one day, gone the next.

16   I didn't cry.  I went into shock.  I spent my whole pregnancy

17   messing up, walking alone, looking up at the stars saying how

18   is this happening, how am I having a baby from a dead man that

19   I had plans with.  Okay.

20             After that, I couldn't hold my child.  I couldn't

21   love my child because she looks so much like her father, and I

22   couldn't bring myself to let that love come out because I was

23   afraid of losing another one because I felt in order for her

24   to be here, he had to die.  To give a life, they take a life.

25             So I had a child with her father ripped from her

1  from the day she was born, from before, and I had to live a

2  mental case for years and years and years with numerous

3  breakdowns and rage and anger, replaying everything that was

4  said to me that night, replaying it in my head over and over.

5  How could I have saved him?  Why did he go?  Why?

6          Why couldn't I tell him that I didn't want him to

7  go?  What was making him go?  Why?  All these questions.  Why?

8  Why?  Why?  But my biggest question is why am I here today?

9  Why?  The victims that have been left behind have been left to

10  suffer all these years.  Did I ever think I'd be here 30 years

11  later?  Did I think from 1994 that I would be sitting here

12  facing you, which I've always dreamed of but knowing that I

13  would never get an answer.  Knowing.  Okay.

14          You took people's lives and you have ruined us,

15  ruined us that we can't see our loved ones.  Our loved ones

16  can never get a life.  My child could never feel her father.

17  My child could never see her father, smell him, nothing.

18  You're young enough to have a life and your life should be

19  behind bars.  Okay.  Like I have felt I've been in a mental

20  prison for 30 fucking -- sorry.

21          THE COURT:  That's all right.

22          MS. GEDZ:  For 30 years I've been in a mental

23  freaking prison filled with rage and anger that I have known

24  where you've been every time you've been transferred.  My

25  dream was to come and sit, look at you in your eyes, but I

1   know I would never get an answer as to why.  Why?

2           So compassionate release, reduced sentence, why?

3   Why?  You deserve everything you freaking get.  You don't even

4   deserve to be in this courtroom.  Okay.  We don't need to be

5   in this damn courtroom.  I'm sorry, Your Honor.

6           THE COURT:  That's all right.

7           MS. GEDZ:  You're looking to get a chance at life.

8   What life have we had?  What life have we had?  I've had PTSD,

9   afraid of people coming after me, being set up the day before

10  I had to testify and you know who.  Yeah, act like you don't

11  know because I'm not even going to say it in the courtroom,

12  okay, because there was a phone call made and I had to be

13  taken somewhere.  All right.

14          You took not only the people's lives but you took

15  our lives because when we lost them, we lost ourselves and I

16  have suffered because of you.  My child has suffered because

17  of you and I'm still suffering because of you, because when

18  the hell are you going to go away and never be seen again?

19  When?  When?  You don't deserve a chance for the things you've

20  done and how you've done them.  A leopard does not change its

21  spots.

22          You're just upset that you can't freaking have

23  freedom.  And why should you have freedom because none of us

24  had freedom.  We've never been free of you, ever, ever.  The

25  only day we'll be free of you is when the good Lord says it's

*Proceedings*                                                        12

1    time.  Okay.

2          And it can't come too soon, I'm telling you, because

3    this has been way too long and this has been way too long for

4    me to look at you and say these things without having to watch

5    what I say.  You ripped lives apart.  You've torn us apart.

6    And you want compassion.  Where was the compassion for us?

7    Where was the compassion to the lives that you took?

8          Why should you get a reduced sentence?  You know

9    what your sentence should have been?  It should have been the

10   freaking death penalty.  It should have been that because then

11   it would have been an even thing.  You shouldn't get to live a

12   life.  You're young enough to fucking -- sorry.

13         THE COURT:  It's all right.

14         MS. GEDZ:  You're young enough to go on with your

15   life and have a family, if you don't already.  Whatever.  I

16   don't know your life, I don't care to know your life.  You

17   shouldn't have one.  Yours is behind bars.  That's where you

18   need to be.  That's where you need to stay.  There is no

19   compassion, and if anybody in here thinks that you deserve

20   compassion, they're just as freaking sick and evil as you are.

21         Because the apple don't fall far from the tree, and

22   you know what I mean.  So you wanted to be just like somebody,

23   well, you did it.  Okay.  You did it.  The only difference is

24   is you're still here.  No compassion.  There is none, not from

25   me, not from any other victim, not from the Rivera family, I'm

1  sure not from Sal's family.  And I'm so glad that you're here.

2  I thought I was going to be the only one.

3           You don't deserve after what you did to him, how you

4  did it.  What you did to me, not that you gave a shit about

5  anybody but yourself to climb a ladder.  That's all you

6  wanted.  There is no young and impressionable.  There is no

7  compassion for you.  You didn't show us compassion, you fool.

8  You deserve nothing.  Nothing.  Nothing.  Because let me tell

9  you, you're young enough, and I know, I know people like you

10 come out after 27, 30 years and they go back because a lot of

11 favors to be owed.  Right?  You think you're going to come out

12 and live a freaking productive life.  You're nothing but

13 garbage.  Garbage.  Okay.

14          And what you did to those victims should only come

15 back on you ten fuck -- excuse me, Your Honor -- tenfold.

16 Because I've waited for this day.  Don't make like you're

17 choking up.  Get the hell out of here.  You're a phony, you're

18 a fake, you're a loser, and you're a killer, and that's all

19 you'll ever be.  Remember that.  You've taken lives.  You've

20 gotten that taste.  Don't act like you deserve anything from

21 anybody.  You deserve nothing but suffering like we've

22 suffered.  Just because we're out in the streets doesn't mean

23 that we're fine.  We hide our pain.  We go on with our lives

24 every day without the loved ones.

25          I don't know how my life would have turned out if he

1    was with me.  I probably would have had a better life.  I've

2    struggled.  I've had freaking breakdowns, winded up in

3    freaking institutions because of you.

4          My kid couldn't even get the proper love from me

5    because of you.  I was afraid to love her because I was afraid

6    she'd be ripped out of my arms and gone.  I was afraid, and I

7    was afraid for years, and I never got help, which I should

8    have, but I dealt with it on my own and I didn't do a good

9    job.

10         You know what, I think maybe today, looking at your

11   pitiful freaking face here wanting compassion that you're not

12   going to get, and I pray to God, I pray that everybody up

13   there just is all around us.

14         You get nothing.  You finish out your four mandatory

15   life sentences without the possibility of parole and you get

16   no compassion, and you don't get to live a life out in the

17   street and have a family and have a kid and make like you were

18   not a bad guy or you're not evil.  Evil does not die.

19         You are pure evil and you are the spawn of evil and

20   there is nothing else you will ever be.  So I would just say

21   stay in prison because you get out, who are you?  Who are you?

22   How are you going to live?  You're a piece of shit.  I hope

23   you rot for the rest of your natural born days.

24         I have suffered and suffered and suffered, and I

25   want you to suffer the way I've suffered and the way he has

*Proceedings*                                                                15

1   suffered and other families have suffered because of the likes

2   of you.

3           You're nothing.  I thought that coming here and

4   having you see me cry was giving you power, but you know what,

5   my tears have stopped because I'm looking at you and I see

6   nothing because you are nothing and that's what you'll always

7   be.  Fucking garbage.  Excuse me.  You're trash.  You're

8   trash.  That's all I have to say right now.   With his pitiful

9   face looking all worried.  You should be worried because

10  hopefully, hopefully, pray to God, that you don't get out.

11  Because you deserve nothing and you'll always be that, evil

12  and nothing.  You have no power.  I'm done.

13          THE COURT:  Thank you very much, Ms. Gedz.  I'm

14  very, very sorry for your loss.

15          MS. BELIZAIRE:  Your Honor, I've been informed that

16  John Sparacino's brother, Salvatore Sparacino, would also like

17  to be heard.

18          THE COURT:  Okay.  For the court reporter, because

19  I've seen it in the writings, but I want to make sure.  It's

20  an N before the C; is that right?

21          MS. BELIZAIRE:  Yes, Your Honor, it's

22  S-P-A-R-A-C-I-N-O.

23          THE COURT:  Mr. Sparacino, if you'll start off by

24  stating your name for the record and remember to use the

25  microphone, and speak slowly enough for the court reporter.

1           MR. SPARACINO:  Salvatore Sparacino.  I'm John

2   Sparacino's brother.  I don't have anything really to say to

3   the Court.  I have something to say to you.  You're the

4   fucking biggest coward I ever met in my life.  I got this

5   image of you, you think you're a hunter, you put an apple down

6   and you run and hide in the tree and camouflage yourself.  You

7   camouflaged yourself as my fucking friend, my family, and then

8   you fucking wait and shoot in the back.

9           You have no balls.  You're a fucking piece of shit

10  and if God fucking has mercy and let's you out, I'll never

11  fucking let this go.  I will never let this go, ever.   Send

12  him home.  Bring him home to me.  You know what I could do to

13  you because you're a pussy.  Your whole fucking life, your

14  whole life.

15          I will eat you alive.  You know you ain't fucking

16  nothing.  You sneak behind people's backs, look them in the

17  eye.  Be a fucking man.  Don't be a rat like your father was,

18  like Sammy the Bull said it in his book.  Your father was a

19  rat.  You must be here because either you're a rat or you're a

20  piece of shit.  I would kill you.  Five fucking minutes alone

21  with you, I would eat you alive and you know that.  Let God

22  have mercy on your soul.  If you ever come home, there will be

23  fucking repercussions.  I promise you.

24          THE COURT:  All right.  Let's take a second here for

25  everyone to calm down some.  Thank you to the marshals.

1          Those are all the family members who would like to

2    speak; is that correct?

3          MS. BELIZAIRE:  Yes, Your Honor.

4          THE COURT:  Let's do this now.  I'd like to hear

5    argument from the lawyers, in part so I think we can calm

6    things down a bit and take the temperature down a bit.

7    Understandably, I think there are a lot of emotions that are

8    running very high here and I just want to step back for a

9    moment and hear from the lawyers.

10          I don't want you to repeat everything in your

11   submissions.  You should trust that I have read them, but I

12   would like you to highlight those things you think are most

13   important for me to consider and focus on and then there will

14   be some questions I might ask you, so I might interrupt you.

15          In particular, there's a question I do want to ask

16   the government, but I'm going to let the defense go first.

17   Bear in mind I'm going to ask you about the government's

18   submission indicating that the defendant has ongoing

19   connections or communications or relationships with Colombo

20   family members.  And obviously, then, I heard a reference just

21   a few minutes ago from Ms. Gedz about that.

22          So I want to hear if the government has any

23   information about those connections or this phone call that

24   was referenced a minute ago.

25          Hold your thought.  Let me first hear from Mr.

*Proceedings*                                                    18

1   Pappa's lawyers.

2           MR. HOPWOOD:  Good morning, Your Honor.

3           I'm going to address the eligibility portion of the

4   argument.  My colleague is going to address the 3553(a)

5   factors.  There are a couple of changes in the law that I want

6   to highlight, one of which we did not brief.

7           When the sentencing commission changed the

8   guidelines last year, they expanded compassionate release,

9   just as Congress did through the First Step Act, and that

10  created a bunch of new grounds.  One of the things that they

11  explained was that with the other reasons provisions, they

12  have commentary in the guidelines.  And it notes that while

13  the guideline says similar in gravity, it rejected that it be

14  similar in kind to age, medical, family, and the new ground of

15  victim of some sexual assault in federal prison.  It doesn't

16  have to be similar in kind.  It just has to be similar in

17  gravity.  I wanted to highlight that.

18          The commission also gave as an example in its

19  commentary that an individual could raise youth at the time of

20  the offense and rehabilitation and that could constitute

21  extraordinary and compelling circumstances.

22          THE COURT:  Mr. Hopwood, the same caution to you.

23  Go a little slower.  Rest assured, I've looked at Amendment

24  804 in the appendix.  I'm aware of what you're speaking about.

25  Go ahead.

*Proceedings*                                                     19

1          MR. HOPWOOD:  There's another change of law that

2    happened last week, April 17th.  The sentencing commission

3    amended Section 5H1.1 on age, and now the guidelines are going

4    to permit judges to depart downward based on age in light of

5    today's retro understanding of brain science and neuroscience

6    surrounding youthful offenders.

7          So the commission has been quite clear that both

8    youth at the time of the offense can be an extraordinary

9    compelling circumstance, and now they've even made clear that

10   when you do initial sentencing hearings, you have the ability

11   to take age at the time of the offense into the calculation.

12         We're relying primarily on Section B5, the other

13   reasons provision, and asking that the Court take that into

14   consideration.  We've just heard testimony here today about

15   who John Pappa was when he committed the offense.

16         THE COURT:  Or statements, not testimony.

17         MR. HOPWOOD:  Yes.  I think what the Court has to

18   understand is the brain and neuroscience behind that.  We

19   don't make light of the crimes he committed.  We can't.

20         We understand the seriousness.  If you look at the

21   brain science, you understand, especially a young man in the

22   18 to 22 year old range, and he was 19 at the time of the

23   offense, we have a greater understanding of why those things

24   occurred, especially in an environment like Mr. Pappa was in.

25         His father had been murdered in part because he

1    didn't carry out orders, and when he was given orders, given

2    what we know about the brain science, it would have been very

3    hard for somebody to say no in those circumstances, even

4    though I think most people would be able to.

5              What Dr. Steinberg's declaration notes is that he

6    meets all the qualifications of transient immaturity and

7    heightened susceptibility to the influence of others.  That

8    would be even more so when you talk about the circumstances he

9    was facing.

10             What's also important to note is, and this goes

11   against some of the statements you just heard, his crimes do

12   not reflect intractable bad character.  We know that people

13   change.  People change, people in prison change, and he has

14   set off on a different path for the last 27 years.

15             I want to talk a little bit about rehabilitation,

16   because it's both a factor for extraordinary and compelling

17   circumstances and goes to the heart of the 3553(a) factors.

18   My colleague is going to largely address that issue.  I will

19   just say, we review lots of prison records and lots of cases

20   in which we're trying to get letters from the Federal Bureau

21   of Prisons employees who work with these people every day, and

22   I think you can trust them over anybody here in the courtroom.

23             I think it's going to be a long time before you find

24   a case with so many letters over such a long period of time,

25   glowing letters of reference from people who have worked with

1    John and worked on his rehabilitation.

2            Lastly, I just want to talk about the unusually long

3    sentence provision.  I know that's a brand new provision.

4    Judges kind of haven't figured out how to directly apply that

5    yet.

6            THE COURT:  Can I tell you this, Mr. Hopwood,

7    because I've had occasion to consider it in another case, and

8    I don't ultimately think it applies to Mr. Pappa because the

9    purpose of it is to allow for consideration of post sentencing

10   changes in the law where there are unusually long sentences.

11           I guess what you're going to say is that somehow

12   this recent change, 5H, is what you are relying on to make

13   that applicable.

14           MR. HOPWOOD:  That, and the Supreme Court's

15   decisions in Roper and Graham and Miller that recognize that

16   people that commit offenses at a young age are far less

17   culpable than those of adults.  We would rely on all those.

18   All the forward movement towards recognizing that when people

19   commit offenses at that age, it does not mean that they will

20   forever be a bad person or a bad character.  All the

21   neuroscience tells us that.

22           So that would be one of the changes in law that we

23   would rely on for B6.

24           THE COURT:  Okay.

25           MR. HOPWOOD:  Do you have any questions for me, Your

*Proceedings*                                                22

1   Honor, on eligibility?

2          THE COURT:  I do not.  I certainly understand your

3   arguments and obviously they're based on various provisions

4   that are in a state of evolution.  I do understand that.

5          MR. HOPWOOD:  I'm going to let my colleague, Mr.

6   Singhal, address the 3553.

7          MR. SINGHAL:  Thank you, Judge.

8          Picking up on rehabilitation, I just wanted to

9   highlight some short quotes from some of the letters.  Officer

10  Werts writes:  In my 22 years working for the Federal Bureau

11  of Prisons, I've only felt comfortable writing a character

12  letter for one other man besides Mr. Pappa.  Officer Clemmons

13  writes:  Despite Pappa's offenses, I would not hesitate to

14  employ him.  His work ethic is the best.

15         THE COURT:  You need to go slower, as well.  And if

16  you'll do me a favor, I know the letters that you speak of,

17  but the spellings of the last names.

18         MR. SINGHAL:  Yes, Your Honor.  Officer Werts was

19  W-E-R-T-S.

20         THE COURT:  And Clemmons is?

21         MR. SINGHAL:  C-L-E-M-M-O-N-S.  These are cited in

22  our initial brief, docket 238, at page 18.

23         THE COURT:  I see all of them.  I'm looking at

24  Exhibit C of your appendix.

25         MR. SINGHAL:  And then Officer Joseph, J-O-S-E-P-H,

*Proceedings*                                                    23

1   writes, I've work with thousands of inmates in 22 years, but

2   there are four incredible gentlemen that work side by side

3   with me through those years and Mr. Pappa was one of those

4   four.

5              I would also highlight in our second supplement, the

6   appendix to what I believe is docket 244, attachment B,

7   Officer Green writes:  During the ten years that -- that's

8   G-R-E-E-N -- during the ten years that I have been employed by

9   the BOP, this is my first letter in support of a reduction of

10  sentence.  There is no person more deserving of a second

11  chance.  He always tells other inmates --

12             THE COURT:  Hold on.  You have to go a little

13  slower.

14             There's no person more deserving of a second chance.

15  Go ahead.  I have observed Mr. Pappa, that's where you're

16  reading from, right?

17             MR. SINGHAL:  I have an ellipsis in there.  And then

18  later on:  He always tell other inmates, quote, this is a

19  rehearsal.  If you don't change now, you won't be successful

20  upon release.  I can honestly say that Mr. Pappa's

21  transformation is authentic.

22             Again, that's obviously difficult to reconcile with

23  the statements you've heard today, but you'll hear from Mr.

24  Pappa, as well.  And in the cases we've cited in our briefing,

25  courts have credited defendants with impressive rehabilitation

*Proceedings*                                            24

1   where they have completed hundreds of hours of programming or

2   dozens of courses, and Mr. Pappa has completed thousands of

3   hours of programming and hundreds of courses.

4          And what I would note is that he's done all this,

5   this education, this self correction, this transformation that

6   strong evidence indicates is authentic when he lacked any real

7   expectation or hope that today would come, when he lacked any

8   hope that we would have a First Step Act that permits him to

9   ask this Court to take that second look that Congress and the

10  Sentencing Commission envisioned would suitably replace

11  parole.

12         And other Courts have agreed, Judge Gershon, Lugo,

13  that such behavior is especially significant for those

14  reasons.  Also, the Reynolds case, and Your Honor also in

15  Rocky Freeman, looked to his record of rehabilitation and we

16  would submit that Mr. Pappa's record is at least as impressive

17  as that one was.

18         THE COURT:  For the record, just so it's clear

19  though, Mr. Freeman's case didn't involve multiple murders.

20  So it was really quite different.

21         MR. SINGHAL:  I'll talk about the circumstances in

22  the A1 sentencing factor in a moment.  As Your Honor knows, he

23  has a release plan to go to South Carolina.  He would intend

24  to stay there.  He intends to never come back to New York.  On

25  that note, I would mention his sister, Christina, is here from

*Proceedings*                                                    25

1   England.  His mother and father are here from South Carolina.

2   His mother is 76 now, as she wrote in her letter, and her one

3   wish is for her son to come home.

4          Turning to the 3553(a) factors, I won't go through

5   each one, but the nature and circumstances of the offense, all

6   lives may have equal value but it does not follow that all

7   murders have equal gravity.  I think we as a society recognize

8   that certain murders are worse; murder of a child, murder of a

9   law enforcement officer, murder entwined with rape.

10         And even in the context of multiple murders, some

11  are worse; murders ordered by a gang leader, shooting sprees

12  of innocents, terrorism.  The factors around Mr. Pappa's

13  upbringing and his being preconditioned to impress his

14  superiors, the fact that he was recruited to murder Scopo, he

15  was not the leader.  With Sparacino he did not fire the shot.

16  That was his codefendant, according to paragraph 35 of the

17  PSR.

18         With Rivera he was recruited by Curcio.  Those facts

19  weigh against imposition of the most severe term of

20  imprisonment.  Looking at the cases, the overwhelming force of

21  the rulings under the First Step Act, is a sentence closer to

22  30 years is appropriate in a case like this.

23         There are other cases that involve multiple murders.

24  Tellier involved four murders, and that case did not have

25  youth as a factor.

*Proceedings*                                                          26

1          THE COURT:  Go back for a moment.  It was Tellier.

2          MR. SINGHAL:  T-E-L-L-I-E-R.  Both Chan and Cheng,

3    the Green Dragon cases that Judge Dearie ruled on, involved

4    multiple brutal murders.  In Cheng, the defendant raped one of

5    two robbery victims and was granted time served after

6    approximately 31 years.

7          THE COURT:  Pausing.  C-H-E-N-G.

8          MR. SINGHAL:  Sorry, Your Honor.  Chan was C-H-A-N.

9    In the Chan case, there were three murders and Judge Dearie

10   said life without parole is quote utterly inconsistent with

11   the goals of criminal sentencing.  In the Cheng case, Judge

12   Dearie wrote that a life sentence was quote far greater than

13   necessary.

14         And so the question arises, is a life sentence

15   necessary here.  Certainly the man that Judge Dearie sentenced

16   in this building 25 years ago deserved to go to prison.  What

17   he said then, I'd like to read a brief quote from that day, he

18   said to Mr. Pappa:  You are as an adult, even a young adult,

19   responsible for your actions.  But I have this abiding sense

20   that that responsibility is shared.  How the mind processes

21   the influences and experiences of life, as I say, is beyond my

22   capacity to fully understand.  But in a case of this sort, one

23   really has to wonder.

24         He then sentenced Mr. Pappa to die in prison.  But

25   the man who sits before you does not need to die there in

*Proceedings*                                                27

1   order for Your Honor to accomplish the goals of

2   Section 3553(a).

3              THE COURT:  I want to just go back to something you

4   said about Mr. Pappa's role with respect to each of these

5   killings.  I'm looking at the government's submission, or

6   perhaps I could just let the government respond, but it seemed

7   to me based on the descriptions provided by the government

8   that Mr. Pappa was really behind the killing of Mr. Sparacino

9   because he was upset that Mr. Sparacino was taking credit for

10  the killing of Mr. Scopo, and that, quite honestly, all these

11  murders seem to be driven in some way by Mr. Pappa's ambition

12  or hubris or bravado, whatever you want to call it, his desire

13  to advance his position within the Colombo family.

14             So your characterization now that somehow he was

15  simply taking orders strikes me as contrary to the facts, at

16  least as explained by the government.  Perhaps I should let

17  the government speak more directly to that.

18             MR. SINGHAL:  May I respond to that briefly?

19             THE COURT:  Go ahead.

20             MR. SINGHAL:  I think we agree with the

21  characterizations that the government made, and according to

22  the PSR what you've stated about his motives and ambition are

23  correct.  We don't challenge that.  We're not here to

24  relitigate the facts.

25             Other Courts' rulings on these motions have looked,

*Proceedings*                                                    28

1    for example, to who played what role in the killing.  And I

2    was arguing simply that according to paragraph 35 of the PSR,

3    it was Hennigar who shot Sparacino in the back of the head

4    killing him.  So I highlight that as a distinguishing factor.

5              The facts that you state about his motives and his

6    ambitions, we both concede and we would argue are consistent

7    with Dr. Steinberg's declaration that he was acting to impress

8    his superiors.

9              THE COURT:  All right.  The one other thing I'll

10   note, though, and I do want you to respond to this, the

11   killing of Mr. Rivera struck me as so senseless, so beyond

12   senseless in terms of concerns about indiscretion or perhaps

13   disrespect.  And all killings are senseless, obviously, at

14   some level.

15             I guess what I'm grappling with is these killings

16   seemed to be motivated by so little actual reason or

17   rationality or purpose or justification, and that word I use

18   very cautiously.  But explain to me more.  I understand the

19   underdeveloped or less developed brain of a young person, and

20   I understand that Mr. Pappa committed these crimes when he

21   hadn't yet reached 20, I believe, but the thin, almost

22   non-existent reason to commit these crimes based on some

23   suspicion about people speaking about acts done by the

24   defendant, things like that, how should I weigh that, in light

25   of your argument that somehow he was too young to understand

*Proceedings*                                                           29

1    the gravity of what he was doing or the consequences of it for

2    others?

3              MR. SINGHAL:  I'd like to respond.  I believe my

4    colleague has a brief answer, as well, if that's okay.

5              THE COURT:  Yes, please.

6              MR. SINGHAL:  I don't know that our argument is that

7    he couldn't understand the consequences so much as that he

8    couldn't say no, and the key fact is that he was recruited by

9    Curcio to be part of the Curcio crew, as indicated in the PSR.

10             And when Curcio decided or agreed for senseless

11   reasons to murder Rivera, yes, the PSR corroborates that Pappa

12   did not object to going along with that.  Pappa was provided a

13   weapon and played his role.

14             But we would argue that he was 19 at the time of all

15   four killings, and his ability to say no to his superiors was

16   substantially diminished.  That does not justify anything, but

17   it makes it less culpable than a similar killing committed by

18   someone who is older.  My colleague has --

19             MR. HOPWOOD:  Yes.  Your Honor, on page 232 of the

20   trial transcript, this did not come out in the presentence

21   investigation report, but what did come out at the trial that

22   he was actually ordered to kill Mr. Sparacino.  That came out

23   at the trial, page 232.

24             THE COURT:  Okay.  Let me hear from the government.

25             MS. BELIZAIRE:  Thank you, Your Honor.

*Proceedings*                                                    30

1          Given that I had one submission and there were a

2    number of subsequent submissions, I'm going to be giving a

3    more fulsome, robust response to a number of things.

4          Your Honor, the defendant is not legally or

5    factually deserving of compassionate release.  His behavior

6    was intentional, it was calculated, it was senseless, and

7    that's only to speak of the murders.  He additionally

8    committed drug crimes out of greed and personal desire, all in

9    an effort to get into or to impress, as the defense claims,

10   the Colombo crime family.

11         His arguments do not collectively make out

12   extraordinary and compelling reasons, nor do the 3553(a)

13   factors warrant compassionate release.

14         Setting aside for the moment that the murders in aid

15   of racketeering would statutorily still mandate a life

16   sentence, that is if the government didn't seek the death

17   penalty.  The effect of the defendant's conduct, as the Court

18   witnessed today in court, is still felt as if it happened

19   yesterday for the family members.

20         It is confusing, it is emotional, the rage filled

21   with a sadness, just utter sadness and devastation, that these

22   family members will never see their loved one again, and the

23   impact of the defendant's conduct not only profoundly affects

24   the victims' families, but his own family as well.

25         So with that backdrop, Your Honor, I would like to

*Proceedings*                                                    31

1    first address the defendant's claim that he makes out

2    extraordinary and compelling reasons that his upbringing and

3    youth at the time of the offense make him less culpable.

4          The Court should reject this for a number of

5    reasons.  Factually speaking, the defendant's upbringing was

6    far from what the cases they cite, the upbringings of those

7    defendants.  The defendant did have some hardships.  He lost

8    his father, which he describes as very painful for him, but

9    that was an involvement in the crime family.

10         The defendant learned and had a firsthand view of

11   what involvement in organized crime could bring to his life.

12   Nevertheless, he not only forged that voluntarily, he took his

13   involvement and aspirations of involvement into his own hands,

14   as most evidenced by the murder of Eric Curcio.  No one

15   ordered him to do that.

16         He argues that his father's death affected him in

17   somewhat contrary and convenient ways.  I don't dispute that

18   it did have an affect on him, but on the one hand he claims

19   that the stories, both the false and true stories, were the

20   basis for his bullying and torment and just to validate the

21   challenges he faced as a child.

22         On the other hand, he argues that hearing the real

23   story about his father's death and the enduring pain of not

24   having a father, ostensibly a reason to run away from a life

25   of crime with organized crime, was a hardship on him growing

*Proceedings*                                                          32

1   up.

2          Now, he tried to impress the very organization that

3   took the life of his friends, his family members, and other

4   people, particularly the lives that he took himself.

5          Now, he had a mother, he had a sister, he had a

6   stepfather.  His sister has accomplished great things.  She's

7   an attorney.  She wrote a wonderful submission on his behalf,

8   and her sentiments are completely understandable.  But there

9   was a way out for John Pappa, and that is evidenced by his

10  sister's own accomplishments.

11         He had a home.  He was raised in the suburbs of

12  New Jersey.  He had shelter.  He had food.  And as the

13  presentence report details, one of the hardships he's faced

14  was when his mother had to sell a home that she owned and they

15  downsized to a smaller rental apartment, shelter nonetheless.

16         He did not come from a broken family.  He still had

17  his mother, he still has his sister.  These I would not

18  describe as a lack of resources.

19         Now, the cases that the defendant cites to speak

20  about upbringing being a factor that Courts have considered in

21  granting compassionate release also speak to age.  I would

22  like to speak about the defendant's age first, and then

23  address the cases that have been cited.

24         The defendant was 19 years old and undoubtedly the

25  defense has submitted copious amounts of data about how youth

*Proceedings*                                                    33

1    affects crime and the brain functionality of someone of that

2    age.

3           However, the defendant's crimes spanned five

4    decades.  Two years prior to his rash of murders, he was

5    involved in the drug trade.  He was about 17 years old when

6    the conspiracy and the distribution charge began.  Then at 19

7    he committed four heinous and senseless murders.

8           THE COURT:  You don't mean decades, you mean years.

9           MS. BELIZAIRE:  I'm sorry.  Five years, Your Honor.

10   Half of a -- sorry, five years.

11          THE COURT:  Understood.

12          MS. BELIZAIRE:  Half of a decade.

13          THE COURT:  Right.

14          MS. BELIZAIRE:  The defendant continued to sell

15   drugs until he was 23, and in the midst of that he was also

16   convicted of attempted criminal possession of a weapon in the

17   third degree at 20 years old.  So he lived a five-year span of

18   committing crimes and injecting dangerous drugs into the

19   community.

20          Turning now to the cases cited by the defense to

21   support the proposition that youth and upbringing are factors

22   this Court should consider, those cases are all incredibly

23   distinguishable.  Starting with *USA versus Chan*.  Chan was

24   completely unsupervised as a youth.  He was searching for

25   things like food and shelter.  He committed his crimes on the

*Proceedings*                                                   34

1   order of days and months after his 18 birthday, setting him

2   aside from his codefendants who got the privilege of being

3   under the age of 18 and, therefore, not facing a life

4   sentence.

5           Judge Dearie spoke of the injustice of that by

6   having been days or months just beyond 18 having a disparate

7   sentence.  And so, the Court could understand why that

8   distinction mattered for Judge Dearie in sentencing Defendant

9   Chan.

10          The defendant, on the other hand, was supervised.

11  He did have shelter, he did have a family.  He has a family

12  who loves him to this day, as they're present in the

13  courtroom.  He had no excuse for turning to the wrong people.

14          Turning to *USA versus Cheng,* who was the codefendant

15  of Chan, that is also distinguishable.  That defendant

16  immigrated to the United States from Taiwan at age 14.  Once

17  he was here, he experienced a difficult adolescence dealing

18  with poverty, absent parents, and physical abuse at the hands

19  of his stepfather.  He dropped out of school at age eight, and

20  by his late teens he was effectively living on his own in

21  homes of various friends in Flushing, New York.

22          The Court noted that the combined influence of

23  obedience, survival, and reputation, survival being the

24  operative word, were part of the totality of the circumstance

25  why even though Cheng was older deserved the benefit of

1    compassionate release.

2         And so the sentencing disparities between

3    codefendants in a singular case is what Judge Dearie was

4    really grappling with.

5         THE COURT:  Let me ask you this.  It's also true

6    that Cheng's crimes, as horrific as they were, I think he was

7    a person who drove others to commit murders, is that right,

8    and then did rape one of the victims of robbery, right?

9         MS. BELIZAIRE:  Yes, Your Honor.  Yes.  That was a

10   distinction that the Court made, that while all of the conduct

11   was horrible and indefensible, he did play a role of being the

12   driver to the murders.

13        And most importantly, I'd like to talk about

14   acceptance of responsibility and remorse.  In a number of

15   these cases, and I'll point them out one by one, but Defendant

16   Cheng, the Court noted, accepted full responsibility for his

17   crimes.  He recognized they were serious and he offered

18   genuine remorse.

19        Cheng said that it was wrong to have joined the gang

20   and to have caused the horrific deaths of the victims.  He

21   called himself the worst of criminals and feels shameful about

22   himself.  He sees that his loss of liberty cannot stand next

23   to the murder victims and the suffering of their families.

24        He continues.  Cheng's past deeds were nothing short

25   of heinous, atrocious, and cruel.  For every wrongdoing he

1   cannot turn his back on, Cheng is deeply remorseful, repentant

2   of what he has done, and he understands the need to condemn

3   them in the strongest of terms.

4           Now, other defendants in *USA versus Glynn*, *USA*

5   *versus Glynn* also renounced his membership and is living in a

6   dropout unit in the court.  And also, in *USA versus Chan*,

7   there was -- he further expressed remorse in a way that was

8   very profound.  The defendant's letter to the Court in the

9   first submission does --

10          THE COURT:  Now you're talking about Mr. Pappa?

11          MS. BELIZAIRE:  Yes, Your Honor.  Defendant Pappa

12  does write a letter to the Court and he explains how he's a

13  changed man.  But what is absent from that submission is a

14  true sympathy and a true remorse and a true negation of his

15  involvement with the Colombo crime family, or his aspirations

16  of becoming a member of the Colombo crime family.

17          What struck me about Defendant Pappa's letter is

18  that he put "my" in quotes.  He talks about my actions in

19  quotes, and that undermines the very acceptance that he claims

20  to be taking.  Like he is both asking the Court to recognize

21  how he's changed, and yet he -- and that he's taken

22  responsibility for his actions, but it's undermined by putting

23  "my" in quotes.

24          THE COURT:  I mean, couldn't the opposite be said,

25  which is he's not blaming his involvement with the Colombo

*Proceedings*                                                      37

1   family or taking direction from others for his bad acts, but

2   rather saying it was his bad acts?

3          Couldn't one argue that he's actually trying to

4   accept responsibility as an individual versus a member of a

5   mob family?

6          MS. BELIZAIRE:  I think he is.  I'm just noting that

7   it's diluted by the quotes around the word "my".  What the

8   quotes do is show that it is not mine.  That's when people use

9   quotes is to say supposedly it is mine.

10         THE COURT:  I see what you're saying.

11         MS. BELIZAIRE:  So it dilutes the effect.  The

12  letter goes on to talk about his own victimization.  He, I

13  think at two junctures, speaks about how he can't believe he

14  did what he did, but as opposed to the other defendants who

15  were deserving of compassionate release, their profound

16  remorse is felt.  It is palpable through the words that they

17  use in describing the conduct that they committed.

18         And so I think that that's another reason the cases

19  are distinguishable from the defendant.  The upbringing, the

20  age, and the lack of remorse are all distinguishable.  I'll

21  note *USA versus Haynes* where the defendant was 23 really had

22  nothing to do with his age.  That had to do with the stacking

23  of 924(c) in a spree of robberies.

24         So that case is in opposite when talking about age.

25  The defendant also fails to make out extraordinary and

*Proceedings*                                                    38

1   compelling reasons by arguing that his sentence will amount to
2   an unusually long sentence and will result in disparities when
3   compared against other sentences; and by arguing that this
4   Court could not consider mitigating circumstances of Pappa's
5   youth and the impact on his family's involvement in organized
6   crime at sentencing because the guidelines were then
7   mandatory.
8           The Court should reject that for a number of
9   reasons.  Primarily, as I started out by saying, the defendant
10  would still be facing two mandatory life prison sentences had
11  he been sentenced today.  Under the guidelines, now responding
12  to the other reasons, argument put forth by defense today and
13  in one of their more recent submissions, the defendant argues
14  the psychology and the brain science, but then cites to the
15  very cases that we've already discussed as how Courts have
16  taken into account youth and age.  Those are distinguishable.
17          Again, the guidelines, while no longer mandatory, it
18  would be an academic conversation given that he would have
19  faced two mandatory life sentences.
20          Now, the defendant was convicted of racketeering,
21  racketeering conspiracy, two counts of murder in aid of
22  racketeering, two counts of conspiracy to commit murder in aid
23  of racketeering, possession of a firearm during a crime of
24  violence, and conspiracy and the underlying distribution and
25  possession with the intent to distribute narcotics.  His

*Proceedings*                                                    39

1    guideline calculations would be the exact same today as they

2    were on the day he was sentenced.

3            Any judge in this courthouse would be well within

4    their rights to sentence him to life in prison under the

5    guidelines, having taken into account his age and his

6    upbringing.

7            THE COURT:  Right.  I think the argument is that now

8    the guidelines are advisory and then they were quote unquote

9    mandatory, even though judges could depart under them but they

10   had to find and explain reasons for doing so.  I think that's

11   the import of the defendant's argument about then and now,

12   which is that judges have been given more authority or greater

13   discretion to vary downward or depart, even if you want to

14   call it that, from the guidelines because they're simply

15   advisory and not truly mandatory.

16           MS. BELIZAIRE:  Understood.  However, the guidelines

17   still require that the Court take into account a number of

18   factors, and those factors which dovetail with the 3553(a)

19   factors would still militate today for a life sentence, even

20   though the guidelines are advisory.

21           And, again, that's having already been sentenced to

22   two mandatory life in prison sentences.  There have been

23   countless cases in this courthouse where Courts today sentence

24   defendants to life in prison.  Most recently in the *United*

25   *States versus Amador-Rios*, the defendant was convicted of one

*Proceedings*                                                40

1   completed murder, one attempted murder, for having been the

2   leader of a gang, Melvi Amador-Rios, and he was sentenced to

3   life in prison.

4          THE COURT:  Oh, maybe Amador-Rios, but his

5   codefendant, Mr. Rivas was only sentenced to 35 years by

6   virtue of 11(c)(1)(C).

7          MS. BELIZAIRE:  Right. I'll speak to the point of

8   pleading guilty before a trial.  The defendant points to the

9   disparities among his codefendants who were either involved or

10  implicated in the death of Joe Scopo.  Pleading guilty does

11  come with benefits because it doesn't put family members

12  through the rigors of trial.

13         It doesn't put witnesses through the rigors of trial

14  and, therefore, there is a benefit to pleading guilty, in

15  addition to not putting victims and witnesses on trial to be

16  cross-examined, to be inconvenienced in life, and to relive

17  the trauma they have already felt by the crime.

18         It's an economy of resources to plead guilty.  Now,

19  starting with Michael Persico, who got 60 years in prison, he

20  was, apparently, only involved in one murder.  Anthony Russo

21  cooperated with the government.  There could not be a more

22  profound renouncement of organized crime than cooperating with

23  the government.  They face retaliation and even death for

24  having done so.  So yes, you do get a benefit when you

25  cooperate with the government.  And Theodore Persico was also

*Proceedings*                                                               41

1    involved in only one or two murders.

2            Now, the defendant, of course, was involved in four,

3    and I'd like to address the 3553(a) factors in terms of the

4    nature and circumstances of his crime and history.

5            To answer the Court's question from earlier about

6    his involvement or his association with crime family members,

7    the government submitted some Bureau of Prison records, and

8    found that there are people contributing money to his

9    commissary as recently as 2023, who are still associated with

10   crime families; not just Colombo, but other crime families as

11   well.

12           I'll start with Carmella Sessa.  As recently as

13   January 12, 2023, and on three days thereafter, that's

14   December of 2022, Carmella Sessa contributed almost $1,000 to

15   the defendant.

16           THE COURT:  Hold on.  Is it C-E-S-S-A?

17           MS. BELIZAIRE:  It's S-E-S-S-A, Your Honor.

18           THE COURT:  I'm trying to look at the record you

19   provided.

20           MS. BELIZAIRE:  Yes, Your Honor.  I can point you to

21   the page numbers.

22           THE COURT:  I see it now.  I just didn't know who

23   was who, so I wasn't quite sure which individuals you were

24   focused on.

25           MS. BELIZAIRE:  Yes, Your Honor.  There are about

*Proceedings*                                                    42

1    seven individuals I'll walk the Court through who have

2    involvement in the crime families.

3              THE COURT:  All right.

4              MS. BELIZAIRE:  Carmella Sessa is the wife of a

5    defendant prosecuted in this courthouse by the name of Ilario

6    Sessa.  His alias was Fat Larry.  He is a made soldier of the

7    Colombo crime family.  Sessa had his first conviction in 1994

8    when he was convicted of conspiracy to distribute narcotics

9    and conspiracy to defraud the United States.  I can give the

10   Court docket cites, if that's helpful.

11             THE COURT:  You need not do that.

12             MS. BELIZAIRE:  He was released in 2009 and was

13   shortly thereafter arrested again for violation of his

14   supervised release related to his continued violation of the

15   non-association clause concerning members of organized crime.

16             In 2011, Sessa was again indicted as a Colombo

17   family associate and ultimately convicted of racketeering

18   conspiracy, including extortion collection of credit and

19   conspiracy and possession of a firearm.

20             Following Sessa's release from prison, he was again

21   arrested on a violation of a supervised release in and around

22   2019.  This could not show a clearer association with a crime

23   family.  These are the people who are giving the defendant

24   money while he's in prison.  So the next is Frank Schwamborn.

25             THE COURT:  Spell that one.

*Proceedings*                                                        43

1          MS. BELIZAIRE:  S-C-H-W-A-M-B-O-R-N.

2          THE COURT:  Okay.

3          MS. BELIZAIRE:  On six different occasions between

4    2018 and 2021, the Schwamborns, Frank Schwamborn and Joanne

5    Schwamborn, collectively sent the defendant $2,200 while in

6    prison.  Frank Schwamborn is a convicted associate of the

7    Genovese crime family, and in 2002 he pled guilty to

8    racketeering, racketeering conspiracy, wire fraud, wire fraud

9    conspiracy, conspiracy to collect unlawful debts, and

10   interstate transportation of stolen checks.

11         So yet another member who is contributing to the

12   defendant's commissary, still a member of the Colombo crime

13   family -- I'm sorry -- Genovese crime family.

14         THE COURT:  Okay.

15         MS. BELIZAIRE:  On the defendant's contact list are

16   a number of players known to also be in organized crime.

17   Frank BF Guerra is listed in his contacts as a friend who he

18   can have email, phone, and mail communications with.

19         THE COURT:  Okay, spell that.

20         MS. BELIZAIRE:  G-U-E-R-R-A.

21         THE COURT:  I see.

22         MS. BELIZAIRE:  And that phone list creation is

23   dated October of 2009 and was last changed September of 2011.

24         THE COURT:  Okay.

25         MS. BELIZAIRE:  Frank Guerra is a convicted Colombo

*Proceedings*                                                    44

1    associate and was inducted or became a made member after

2    serving jail in about 2021.

3          In 2013, Guerra went on trial for two murders

4    involving -- including an involvement in the murder of Joe

5    Scopo.  Though he beat those murder charges, he was convicted

6    of a drug conspiracy.  During his sentence Judge Townes found

7    that the government proved by clear and convincing evidence

8    that Guerra committed the murder of Scopo.

9          Now, I would like to contextualize the murder of

10   Joseph Scopo.  Joseph Scopo was an acting crime boss in a

11   faction of the Colombo family.  Many people wanted to murder

12   Joe Scopo and, in fact, many people were involved in his

13   murder.  The defendant happened to be one of the crew members

14   on the hit team who had the guns that actually gunned down Joe

15   Scopo.

16         So when this Court hears that various people were

17   convicted or involved in the murders of Joe Scopo, it's

18   because it was such a collective effort by the faction that

19   the defendant was loyal to that carried out that murder that

20   many people are, in fact, responsible for that.

21         THE COURT:  Can I ask you a question?  In your own

22   letter you say it was the defendant who immediately pursued

23   Scopo, striking him three times with gunfire, once fatally.

24         MS. BELIZAIRE:  Yes.  He was actually the man, the

25   foot soldier on the ground with the gun gunning down Joseph

*Proceedings*                                                45

1   Scopo.  The defendant is responsible for having killed him.

2           THE COURT:  And Judge Townes' finding with respect

3   to Guerra is that he was part of the same crew that was

4   hunting down Mr. Scopo?

5           MS. BELIZAIRE:  Yes, Your Honor.

6           THE COURT:  Okay.  Understood.

7           MS. BELIZAIRE:  George Zappola, whose nickname is

8   George Neck.

9           THE COURT:  Spell that.

10          MS. BELIZAIRE:  Z-A-P-P-O-L-A.

11          THE COURT:  Okay.

12          MS. BELIZAIRE:  He's listed as a friend with whom

13  the defendant can have phone and mail communications.  That

14  was created on November 12th of 2019.

15          He's a convicted Lucchese captain, who pled guilty

16  in 1996 to numerous counts, including racketeering,

17  racketeering conspiracy, multiple counts of conspiracy to

18  murder, two counts of murder accessory after the fact,

19  concealing person from arrest, and conspiracy to defraud the

20  United States.  He was sentenced to 22 years.  I'll mention

21  three additional names.

22          THE COURT:  Is Zappola in jail now?  When was that

23  sentence?

24          MS. BELIZAIRE:  He is out.  It was 22 years in 1995.

25          THE COURT:  So hence the November 2019 contact

*Proceedings*                                                    46

1   creation?

2           MS. BELIZAIRE:  Yes, Your Honor.

3           THE COURT:  Okay.  Got it.

4           MS. BELIZAIRE:  Anthony Loffredo, L-O-F-F-R-E-D-O,

5   and his wife, Ms. Loffredo, are listed as friends from whom he

6   can receive mail.

7           Anthony Loffredo, also known as Tony Bones, is a

8   convicted Lucchese associate, including a murder conviction.

9   He pled guilty to racketeering in 2000, and was sentenced to

10  252 months.

11          THE COURT:  So he's in jail?

12          MS. BELIZAIRE:  He apparently just was released last

13  year.  He was also inducted into the Lucchese family.

14          THE COURT:  When was that contact established?

15          MS. BELIZAIRE:  I don't have the benefit of that,

16  Your Honor.  Some of the contacts don't -- if you do a control

17  find -- don't all have dates when they were updated, though

18  where I've told the Court the records do reflect.

19          THE COURT:  All right.

20          MS. BELIZAIRE:  Finally, not finally, two more.

21  Joseph Savarese, S-A-V-A-R-E-S-E, whose nickname is Joe Saf is

22  also listed as a friend from whom he can receive mail.  There

23  is no date associated with that contact.

24          He is a convicted Colombo soldier, and in 1996 he

25  pled guilty to racketeering.  He was sentenced to 174 months.

1  In 2012 he pled guilty to racketeering conspiracy and received
2  a sentence of 125 months.  He is also out of jail.
3          And then, finally, Joe Chilli, C-H-I-L-L-I, and his
4  wife, Rose Chilli, also not dated, though they are listed as
5  friends from whom he can receive mail.  Joe Chilli is a
6  convicted Bonanno soldier.
7          THE COURT:  Do you have a date of that contact being
8  established?
9          MS. BELIZAIRE:  I don't, Your Honor.
10         THE COURT:  Okay.
11         MS. BELIZAIRE:  Joe Chilli pled guilty to conspiracy
12  to distribute and possessed one kilogram or more of a
13  substance containing heroin, and five kilograms or more of a
14  substance containing cocaine back in 2000.  The Chillis are a
15  multigenerational family of Bonannos.
16         So at first glance the defendant has a number of
17  contacts throughout the course of his time in prison where he
18  has not rejected or renounced associations with people who are
19  affiliated with crime families.
20         That also distinguishes him from the defendants who
21  expressed remorse and who are in dropout units and who have
22  renounced their gang affiliation.
23         Now, turning to the 3553(a) factors.  This defendant
24  committed four murders, which is one of the most serious
25  federal crimes that a person can commit.

*Proceedings* 48

1         He was not being recruited.  He was ordered to kill

2    Joe Scopo, but the other murders, as the Court has pointed

3    out, seem to be on his own volition to get credit for the

4    murder of Joe Scopo.  It is greed, it is ambition, it is

5    hubris, and that is why three additional people were murdered.

6         Not only were they murdered, they were degraded.

7    Rolando Rivera had the misfortune of being friends with John

8    Sparacino and the misfortune of having too much information.

9    Those trivial triggers are what caused the defendant and

10   another to take him from his home, shoot him in a car, push

11   him out of a moving van leaving him alive, undoubtedly a

12   terrible way to suffer.

13        He hadn't yet succumbed to those gunshot wounds, and

14   police found him alive.  He suffered until he was found by the

15   police and he suffered until he died.  You heard from Ms. Gedz

16   today.  She is absolutely devastated by this.  I don't need to

17   recount that.  You got to see it firsthand, and I appreciate

18   the Court's indulgence in hearing that.  But her trauma is

19   still felt today, every single day she is alive.

20        THE COURT:  Let me pause you for one second and

21   check with our court reporter.

22        (Pause.)

23        MS. BELIZAIRE:  John Sparacino, his murder was

24   equally egregious, all because the defendant wanted credit for

25   murdering Scopo.  And the irony of wanting compassion when at

1    the time murders were not a result of not only a lack of

2    compassionate, but greed and credit, a desire for credit for a

3    murder.  And the messaging surrounding John Sparacino's murder

4    was truly outrageous.  It was not enough to kill him, but he

5    was hogtied, mutilated, a flap of skin was cut off of his face

6    and, of course, the most degrading fact, as the Court knows,

7    his penis was chopped off and put into his mouth, because

8    death wasn't enough for John Sparacino.  The family members

9    have pain and suffering, again as this Court witnessed in this

10   courtroom today.

11         The 3553(a) factors do not militate towards a

12   compassionate release.  The defendant committed more murders

13   than any of the cases cited, and murderers in this courthouse

14   routinely get multiple life sentences, in large part to

15   promote respect for the law, to provide just punishment, and

16   to afford adequate deterrence to others and to protect the

17   public from further crimes of the defendant.

18         The victims live in fear that this defendant will

19   get out and exact retribution against them for having come

20   here today to speak to this Court about how his crimes have

21   impacted them.

22         That is also palpable, and was felt in this

23   courtroom today.  They will never get any relief.  They will

24   never have peace of mind.  They will never share a holiday

25   with their loved one.  And so a sentence -- the sentences that

*Proceedings*                                                    50

1  were imposed on the defendant when he was sentenced are still

2  appropriate today.

3        I believe that addresses all the arguments.  I'm

4  happy to answer any questions the Court has.

5        THE COURT:  No.  That was certainly sufficient and

6  filled in some blanks with respect to the alleged connections.

7  There is one other question about the phone call that Ms. Gedz

8  referred to.  What, if anything, have you determined about

9  that?

10        MS. BELIZAIRE:  My understanding is that is a phone

11  call that she received back before she testified, and it was

12  in an effort to intimidate her and dissuade her from coming to

13  court to testify against the defendant.

14        THE COURT:  Was the government able to determine who

15  made the call?

16        MS. GEDZ:  Yes.  Sorry.

17        MS. BELIZAIRE:  No one was ever arrested in

18  connection with that call.  I think it was once removed, and

19  given that the defendant -- I think ultimately the caller, as

20  I understand it from Ms. Gedz, is that it was someone who was

21  told by someone else to call her to convince her to not come.

22        THE COURT:  Again, this is back in 1994?

23        MS. GEDZ:  1997.  No, 1999, before the trial.

24        THE COURT:  Okay.  Thank you.  That clears that up.

25  Thank you.  Let me hear from the defense.  These ongoing

*Proceedings*                                                    51

1   connections or receipts of money with convicted and known

2   crime family members is something I want to understand better.

3           MR. HOPWOOD:  Okay.  Well, Your Honor, first, I want

4   to address one quick fact about Mr. Pappa's upbringing.  His

5   father was murdered at five.  His stepfather was arrested.

6   They actually lost that house.  And so while the upbringing

7   may be slightly better than in those other cases, it's still

8   not like this was a good family dynamic.

9           And the fact that his sister has gone on to become a

10  lawyer just shows you that two kids in trauma can have

11  different responses, and that's what we would say to this.

12          THE COURT:  Let's go back, though, to that.  The

13  government's point is that -- I mean the trauma he suffered

14  was his father being killed, but his father was killed by the

15  organization that he then so eagerly wanted to join.  Can you

16  explain that?

17          MR. HOPWOOD:  Young men are not rational, Your

18  Honor.  That's probably the best explanation for it in a

19  nutshell.  He saw that, was traumatized by it, and some people

20  run from that, like his sister did, and some people run into

21  it.  It's perfectly consistent with Dr. Steinberg's

22  declaration on the brain science around that.

23          The government was parsing Mr. Pappa's letter about

24  remorse.  What I want to tell you about the remorse is, don't

25  look at his letter.  Look at his actions.  He is a victim

*Proceedings*                                                      52

1    impact facilitator at the prisons he's been at, trying to help

2    people like him have self-reflection on the harm they've

3    caused and how they can repair that harm, and he has gone

4    about trying to do everything he could.  The reason you see

5    all those letters from BOP officials is because John Pappa is

6    well known in the federal system for doing re-entry work and

7    doing rehabilitation work with other prisoners.  He's a leader

8    on this.  He's well known within the system.

9          As to these people that he has been communicating

10   with, a lot of those names are people that John has served

11   time with in other prisons and has remained in communication

12   with.  One of the names that we noticed off the list was a

13   client of ours, Adam Clausen, who was serving a 213 year

14   prison sentence, was granted compassionate release.  He and

15   John did re-entry work together at a prison and now Mr.

16   Clausen is out in Las Vegas doing re-entry work for the Nevada

17   State Department of Corrections.  And so John has remained in

18   contact with people that he has done this re-entry work with.

19          As for Mr. Sessa, John says that is a friend of his

20   father's who he's never spoken to, but this man sends him

21   money every Christmas.  John doesn't know why, but it's not

22   somebody he's in constant communication with.  Most of the

23   other names on there that they list were people that John has

24   done re-entry work or served time with.

25          THE COURT:  Hang on a second.  Let's go back for a

1    moment.  You're saying, because obviously the government has a

2    very specific list, so Mr. Sessa or Mrs. Sessa, you've

3    explained, but then there's Mr. Schwamborn who sent him

4    $2,200.  Again, is that someone he did re-entry work with?

5              MR. HOPWOOD:  No, no, no.  Mr. Sessa is somebody

6    John has never talked to.

7              THE COURT:  No, Schwamborn.

8              MR. HOPWOOD:  Yes.  He was in prison with that man.

9              THE COURT:  And so he sends him money because?

10             MR. HOPWOOD:  I don't know why, Your Honor, he sends

11    him money.  They're friends.

12             THE COURT:  But Mr. Schwamborn is a convicted member

13    of the Genovese crime family, no?

14             MR. SINGHAL:  Your Honor, may I make a suggestion to

15    give your court reporter a break.  If you could tell us the

16    names that we can talk with Mr. Pappa about for five minutes.

17             THE COURT:  Let's take five minutes.  We'll start

18    again at quarter of 12:00.

19             MR. SINGHAL:  Which names are you most interested

20    in?

21             THE COURT:  I'll tell them to you perhaps off the

22    record because they were recited by the government.

23             (Off the record discussion; Recess taken.)

24             THE COURT:  Before I hear from the defense, I did

25    want to extend an apology to the family members of the victims

*Proceedings*                                              54

1    for, in effect, re-traumatizing you by having this hearing.  I

2    hope you understand that because I was not involved in the

3    original proceedings and only recently was assigned to this

4    matter, that it felt important for me to be able to see and

5    hear from everyone who has such a strong interest in this

6    case.

7            That's why I'm holding the proceeding and giving

8    everyone an opportunity to speak, and be heard and also seen.

9    I realize that there are consequences to that, and for that I

10   do apologize.

11           So I made that comment, I'll just note, without the

12   defendant being present.  I don't think that that's relevant.

13   Let me hear from the petitioner's lawyers on these alleged

14   ongoing contacts with members of crime families.

15           MR. HOPWOOD:  So it is not uncommon for people to

16   serve time together and then when one person is released to

17   send money back to their friends.  That is a very common thing

18   within the Federal Bureau of Prisons.  A lot of that is what's

19   going on here, Your Honor.

20           George Zappola was someone that Mr. Pappa served

21   time with in Allenwood.  Frank Schwamborn was someone that he

22   served time with in Allenwood and who has sent Mr. Pappa some

23   money.  Joe Chilli is someone that Mr. Pappa served time with

24   at Edgefield.  Anthony Loffredo, he served time with at BOP at

25   MDC Brooklyn, and Joseph Savarese sent Mr. Pappa a picture and

*Proceedings*                                                                55

1    it was denied by the Bureau of Prisons, and he has not had any

2    communication with him.  This does not speak to ties to

3    organized crime more than it does friendships made with people

4    inside the Federal Bureau of Prisons.

5           Again, I guarantee you there are more people on that

6    list that have felony convictions that are not tied to any

7    organized crime members but that John remains in contact with

8    because they served time together, and he did do some

9    rehabilitation and re-entry work with a whole host of people

10   who have now been released from prison.  I want to call your

11   attention to that, again.

12          He was a victim impact facilitator who quote:

13   Promotes acceptance of responsibility, genuine remorse,

14   empathy, and making amends.  That is how Mr. Pappa has tried

15   to carry himself for the last 20 or so years.

16          He knows he can't go back and change the things that

17   he did.  So he has been trying to make sure that people that

18   come out of Federal Bureau of Prisons don't go back to the

19   life that they had before, and he is a leader on that issue.

20   And I think given the BOP letters you have and his release

21   plan, you can have a lot of assurance that when he's released

22   he's going to South Carolina and he's going to continue to do

23   this work.

24          THE COURT:  Let's discuss in the broader point that

25   the government is making with respect to these ongoing

*Proceedings*                                                                        56

1    contacts with individuals who have been convicted, and some

2    pretty recently of criminal activity involving enterprises,

3    such as the Colombo crime family and the Lucchese crime

4    family.

5            The defendant hasn't, it appears, expressly

6    disavowed, I guess, association with crime families or showing

7    remorse for his own involvement, for his involvement with

8    these crime families.  Perhaps you can answer that question,

9    or at least the government's argument or accusation in that

10   regard.

11           MR. HOPWOOD:  First, I'd point out that the

12   government has had these motions now for 16 months.  If there

13   was some communication, all phone calls are recorded in the

14   Federal Bureau of Prisons.  The mail is monitored, the email

15   is monitored.  If there was some sort of there there with

16   respect to John facilitating with organized crime members, the

17   government would have it and be presenting it to you.

18           THE COURT:  I'm talking more about attitude and what

19   you allege is a changed man.

20           MR. HOPWOOD:  I think rather than having me answer

21   that, Your Honor, at the end Mr. Pappa is going to address

22   that.  I don't think I can do it justice like he will be able

23   to.

24           THE COURT:  Is there anything else you wanted to say

25   in response to the government's argument?  Yes, Mr. Singhal.

1        MR. SINGHAL:  Sure.  Briefly on the cases, I don't

2   want to belabor the point, but Chan, that defendant did

3   personally shoot, commit a murder, and Chan lost his father at

4   14.  So he had at least more of a stable childhood and

5   upbringing until that point.  He also had an exceptionally

6   poor record in the Bureau of Prisons, acted violently for the

7   first decade, and that is documented in Judge Dearie's

8   opinion.

9        Cheng, yes, was just the driver, but Judge Dearie

10  rejected that as a reason to treat him as less culpable

11  because he did it over and over again, knowing what was going

12  on.  That's also in that opinion, and Cheng was 20.  Glynn was

13  22, and he was a Bloods leader.  So he personally committed a

14  murder, but also recruited others, provided the firearms, and

15  as a leader, his life sentence was reduced to 35 years.

16        Finally, I'll note Ramirez, R-A-M-I-R-E-Z, Judge

17  McMahon's opinion, that reduction was only from 48 to 40 years

18  but that was also a leader that led a criminal organization

19  for years, personally participated in two murders, and

20  instructed another member of his organization to shoot and

21  kill a rival drug dealer.

22        So we would say that some of these cases were

23  arguably more serious facts in that the defendants were

24  leaders of the organizations, at least as serious, and

25  received relief comparable to the relief we're requesting.

1    We also note that Mr. Pappa has served the

2  equivalent of approximately 32 years after factoring in the 45

3  day per year good time.  So his 34 [sic] times .85 is I think

4  27.2.  So that's in the range of the reduction, reduced

5  sentences, that Courts seem to grant in circumstances that we

6  argue are similar to these.

7    Finally, on the point about his letter, I think the

8  government steps too far in trying to read the scare quotes as

9  being scare quotes.  Mr. Pappa teaches the importance of using

10  "I" statements in his victim impact sessions.  I honestly

11  believe those are for emphasis, not to somehow undermine the

12  idea he means my as my.

13    THE COURT:  I'll hear from Mr. Pappa.  Did the

14  government want to say anything before I hear from the

15  defendant?

16    MS. BELIZAIRE:  Yes, Your Honor.  My apologies.  I'd

17  like to just address the rehabilitation, which I did not do at

18  first.

19    THE COURT:  Yes.

20    MS. BELIZAIRE:  Indeed it is something to be proud

21  of, something that the defendant should put before this Court.

22  However, it's not unique to the defendant.  The cases cited by

23  the defendant of individuals who are involved in organized

24  crime all have robust efforts at rehabilitation while in

25  custody.

1           So it is commendable and something that we should

2     all as a society encourage, but it is not distinct as compared

3     to other cases.  I'd like to address this concept of having

4     dual worlds or split personalities.

5           It's not something that's foreign to La Cosa Nostra,

6     which is the collection of the crime families.  In fact, the

7     entire concept of the mob and the five families was to protect

8     their community.  But it was at a heavy, heavy cost.  It was

9     often at the cost of killings, of robberies, of extortion, and

10    it was all premised, ostensibly, on helping and protecting

11    their community.  So this disjunct of helping and advancing

12    the community is not at odds in this world with also

13    committing serious, heinous crimes.

14          And that is something that's unique, I think, to

15    organized crime families is this duality of doing good and

16    also doing incredibly evil things.  Another hallmark of the

17    Colombo crime family and other crime families is death before

18    dishonor.  It is common for defendants who are aspiring made

19    members of their respective families to do long prison

20    sentences and be inducted thereafter.

21          Death before dishonor is the mantra that allows the

22    defendants to hold strong to their family ties while

23    incarcerated in the effort of being inducted while in jail or

24    after they're released.  That is true with some of the people

25    on the defendant's contact list, as I listed earlier.  And so

*Proceedings*                                                        60

1   the defendant's lack of a disavow of his membership, or his

2   allegiance, or his aspirations of being a member of the crime

3   family is something that this Court should consider in the

4   context of organized crime families.

5           THE COURT:  Are you suggesting that there really is

6   or that there's a real concern that Mr. Pappa is going to

7   rejoin the Colombo crime family, or one of the LCN crime

8   families if he's released from prison?

9           MS. BELIZAIRE:  Yes, Your Honor.  As evidenced by

10  Frank Sessa's induction after his long incarceration, as

11  evidenced Frank Guerra's induction after his long

12  incarceration, and Larry Sessa's induction after

13  incarceration, there is a reward for having served long prison

14  sentences.  That is not to make light of what the victims

15  fear, and the fear that they've put on the record today.

16          THE COURT:  All right.

17          MR. HOPWOOD:  Your Honor, may I respond?

18          THE COURT:  Go ahead, Mr. Hopwood.

19          MR. HOPWOOD:  Your Honor, I don't think you have to

20  fear him going back to organized crime.  If he was going to do

21  that, he would be doing that in the Federal Bureau of Prisons,

22  rather than what he has been doing.

23          He's got 20 years of rather remarkable

24  rehabilitation efforts pointing him in a completely different

25  direction, and I think you can take confidence from those

1    letters from BOP folks.  I don't think he snookered everyone

2    at the Federal Bureau of Prisons into thinking that he is

3    going back to a life of crime.  He could very easily.  It's

4    very well known that people in organized crime, when they're

5    in prison, remain in organized crime.  There is no record that

6    he's done that.  Instead, his record is the opposite.

7            THE COURT:  I guess, at least to paraphrase what the

8    government is arguing and certainly some of the victims'

9    family members are saying, is that perhaps he's smart enough

10   to realize that he'll get out sooner if he convinces everyone

11   that he's seen the light.  I guess if one were to be cynical,

12   the reason to do that when you're in jail on a life sentence,

13   because obviously, as you mentioned at the outset, contrary or

14   despite the fact that he's been sentenced to die in prison,

15   he's embarked on this remarkable effort at rehabilitation.

16           The flip side of that, one could say, the more

17   cynical view of that is that it's a calculated way of trying

18   to get out of prison or maintain some potential to get out of

19   prison to rejoin and restart his life of crime.  That

20   certainly seems to be the government's argument, to some

21   extent, and obviously the fear of the victim's families.

22           MR. HOPWOOD:  Yes, but prior to 2018 there was no

23   light at the end of the tunnel.  And actually prior to 2020

24   when this Court and Courts in the Southern District of New

25   York started granting compassionate release cases for people

*Proceedings*                                                              62

1    who had committed murders, there was no view, rational view

2    from him, that anything he was doing was going to lead to

3    early release.  So he was doing it for the right reasons.

4              THE COURT:  Actually, let me turn back to the

5    government.  I mean, obviously, I could debate this myself,

6    but I am curious about the government's response on that.

7              You're right that obviously there's a history of mob

8    members counting on serving their time and then becoming made

9    members once they get out, you know, for standing firm and not

10   snitching and doing all the things they're supposed to or

11   expected of them as crime family members.

12             But this is a situation where the defendant had no

13   reasonable hope of ever getting out of prison and rejoining

14   any of the families because he had been sentenced to multiple,

15   not just one, but multiple life sentences.  So isn't the more

16   logical inference that he's actually genuinely seen the light

17   and tried to make amends while in prison, even if for the rest

18   of his life?

19             MS. BELIZAIRE:  I don't know that I would

20   characterize that as making amends.  I think that might be

21   turning a page for himself.  But what I think is more profound

22   is the lack of what seems to be, and of course we'll hear from

23   him momentarily, the lack of remorse for the carnage that he

24   left behind.  You can turn a new page in prison and do good

25   things for yourself and to better the community that you're

*Proceedings*                                                      63

1   in, not dissimilar to having done so in the outside world.

2   But there, at least from the government's vantage point, has

3   been very little in the way of addressing the carnage that he

4   left behind.  I think it's a productive use of his time and

5   it's commendable, but I think it is not a persuasive point to

6   me, to the government at least, that he has made amends, to

7   use the Court's words, for the crimes he has committed.

8           THE COURT:  That he's actually made amends or that

9   his purpose is to make amends, his goal is to make amends?

10  Those are two different things.  Are you saying you don't

11  think he's actually done any good, or you're saying his

12  motivation is not to do good for others but simply to make his

13  circumstances, be that a life sentence in prison better?

14          MS. BELIZAIRE:  The latter, Your Honor.

15          THE COURT:  I understand.  Thank you.  Mr. Pappa,

16  I'm going to allow you to make a statement at this time, as

17  well.  Take your time.

18          THE DEFENDANT:  First, Your Honor, I renounce all

19  crime and --

20          THE COURT:  Keep your voice up, please.

21          THE DEFENDANT:  Okay.  First, I want to thank God

22  and thank you for this opportunity.  I'm gracious beyond

23  belief.  I've spent my 20s, my 30s, and my 40s continuously

24  conducting self examinations, and I've fully come to

25  understand why I did what I did and why I'll never in life do

1   it again.

2            THE COURT:  Tell me why.

3            THE DEFENDANT:  As I grew up, this was all I knew.

4   And the government pointed out, they had said -- she had said

5   that why -- I said with my father and I couldn't believe that

6   I got to the point where I thought it was okay to do these

7   things.  That was when everything dawned on me.  I never

8   stopped to think.  When I was brought up, everything was

9   victim blaming.

10            I accepted my father's death as something that could

11   be normal.  People told me your father died because he did the

12   wrong thing.  He was such a great man and such a wonderful

13   man.  So that's what I believed.

14            THE COURT:  Sorry to interrupt you, again.  Why join

15   the organization that killed your father?

16            THE DEFENDANT:  Because I thought I was going to do

17   this better than my dad and that's what I was supposed to do

18   and that's what I was in line to do.

19            You get your beliefs from what people tell you, and

20   from what you hear, see, and think is expected of you.  And

21   that's what I did.  I believe wholeheartedly that this was

22   expected of me.

23            THE COURT:  What was expected of you?

24            THE DEFENDANT:  To follow in my father's footsteps,

25   to get into crime and do these things, and that's what I did.

*Proceedings*                                              65

1   After my father died, I don't like to bring this up, I never

2   got to hear what really happened with my dad as a kid.  I

3   learned about it from people outside my household because my

4   mother wanted to shelter us from that.  So everything I ever

5   learned and heard was glorification of my father.

6          The prosecutor is right in the sense that I had an

7   okay life between my father's death and up until the time when

8   we literally lost our home.  Everything caved in at that time.

9   When my mother remarried, I wanted nothing to do with my

10  stepfather at that time.  So I think my sister put it best,

11  all the male role models that I had and the people who I

12  respected were people who were my father's ilk.  I did want to

13  be like my father, 100 percent, with all my heart.

14         And prison is when, as I told you in the letter,

15  when I rediscovered my humanity.  Teaching the victim impact

16  and doing the Challenge Program were actually stigmas in the

17  penitentiary.  It was frowned upon.  People looked at you like

18  you're going in the Challenge Program.  And when I went in the

19  Challenge Program, I had no reason at all to go into the

20  Challenge Program.  I stayed in the Challenge Program after I

21  got there as a mentor.

22         THE COURT:  Why did you go into the program then?

23         THE DEFENDANT:  Originally because one of the

24  facilitators, they were starting new, they needed people, and

25  they knew I taught classes and did classes in the gym.  So

1    they said why don't you come over here, we think you could be

2    an asset and be good in the unit.  I really didn't want to go

3    because at the time I actually was happy in my unit.

4           I said you know what, let me try it.  I'm going to

5    go and check it out.  When I went in there, I touched on a lot

6    of this in my letter to you, when I went in there there was a

7    lot of people who couldn't read.  They had a really hard time

8    reading.  So I got involved with helping them understand the

9    concepts, and it became rewarding.  I really felt like I found

10   myself.

11          But my transformation started way before then.  It

12   started when I ended up getting a letter, and the person who

13   wrote me the letter, they started writing me.  I don't know

14   who it was.  It's probably on that contact list somewhere.  I

15   wrote back and forth to this person.  It was a girl, probably

16   in the early 2000s.  She was kissing the envelope and back

17   then people sprayed perfume, and out of nowhere I got a

18   question that said, don't you ever feel bad about what you

19   did.

20          At that time I was hoping that I could find some

21   newly discovered evidence, and I wrote back.  I said I can't

22   feel bad about what I did because -- I mean I can't feel bad

23   about that because I didn't do it.  I didn't do these things.

24   But that letter weighed on me because I got a response, and

25   the response was, basically, I can't believe that you don't

*Proceedings*                                                    67

1   feel bad about what you did.

2          That was the first time that it was in my head that

3   I made other people feel the exact same way that I felt with

4   regard to my father's death, and how I made my sister feel,

5   how my sister felt and my mother felt, and how it ruined their

6   lives.  I know I ruined their lives.  I apologize to them from

7   the bottom of my heart.  That's when I had the epiphany.

8   That's when it changed.  That's when I felt horrendous.  As I

9   told you in the letter, I hit a point where I hated myself.  I

10  mean I hated myself.

11         That's why I feel their hate and I feel their pain

12  now, and I understand it with all my heart.  I vowed I was

13  going to do everything in my power to change myself and became

14  the person who I should have been.  I committed myself every

15  single day, every day I'm doing what I can to make amends.  I

16  made a conscientious decision to live differently, and that's

17  what I'm doing.  He had said it earlier, the guy that Judge

18  Dearie sentenced deserved prison, belonged in prison for a

19  long time.  I know that.

20         When I made that decision it changed my life.  I did

21  everything that I possibly could.  You won't find a guy with

22  an organized crime case.  I added up when I thought I was

23  going to do this myself, this motion, and I added up five of

24  the cases, Freeman, Russo, Monteleone, Tellier, Lugo, if you

25  add up those five cases, the amount of programs that they did,

*Proceedings*                                                68

1    I have done more programs than they did in like a quarter of

2    the time.

3            When we talk about rehabilitation, I've done this

4    because this is it, this is real.  I don't want to go to

5    New York.  I'm not going back to New York under no

6    circumstances.  I welcome the most stringent supervised

7    release restrictions that there are.

8            I want to -- my friend, Adam, just sent me a letter.

9    He was in prison too.  He wrote a letter on my behalf to you.

10   And he just sent me pictures from the anniversary for the

11   First Step Act.  He was in there with some senators and stuff.

12   He said brother, I just can't wait for you to get home, he

13   says, because we need you out here.  I'm going to commit

14   myself to helping kids, who are in the same -- growing up in

15   the same situation as me.

16           This is emotional.  I've learned my incarceration

17   has been beneficial.  It's been productive.  It's been

18   transformative.  I've completely changed my way of thinking,

19   my belief system.  I've learned that working as hard as you

20   possibly can, being honest and helping others, that those are

21   the three keys to a meaningful life.  I now see things

22   clearly, act correctly, and my actions are positive,

23   effective, and completely unselfish.

24           I just hope that you'll consider the changes that I

25   made based on my actions, and not the words of these people.

*Proceedings*                                                    69

1   I feel horrible for the last --

2            MR. SPARACINO:  And the Oscar goes to you.

3            MS. GEDZ:  Exactly.

4            THE DEFENDANT:  That I caused.

5            MR. SPARACINO:  I can't listen to this piece of

6   shit.

7            THE DEFENDANT:  The victims and their families.  And

8   if you find me worthy of some type of mercy, you have my word,

9   I'm going to spend the rest of my life proving myself to you,

10  to my family, and to my community.  Whichever way this

11  decision goes today, I'll embrace it with willing acceptance

12  and I'll continue on my path that I've been on because I feel

13  good and I'm happy with who I am today.

14           Like I said, I do, I renounce all crime.  I won't go

15  near nothing.  I don't want no part of anyone, no part of

16  anything.  I've worked so hard at conquering my ego.  These

17  are the things I work on to this day.  There's only one word

18  that could come up in my mind right now, and that's I'm

19  grateful for this opportunity.  I never foresaw this.  And

20  just thank you and I'm sorry for it was so jumbled.

21           THE COURT:  Thank you, Mr. Pappa.  Unless any of the

22  lawyers want to say anything further, as I said before, I'm

23  not sentencing or deciding on resentencing, I should say, Mr.

24  Pappa today.

25           So to be clear, I haven't decided whether or not I'm

*Proceedings*                                                    70

1   going to grant the request for compassionate release and then

2   resentence him if I did.

3           I'm going to take this all under advisement.  I

4   appreciate everyone's thoughts and comments and certainly the

5   statements from the family members, as well, and the statement

6   from Mr. Pappa.  Does the government want to say anything

7   further?

8           MS. BELIZAIRE:  Nothing further, Your Honor.

9           THE COURT:  Mr. Hopwood or Mr. Singhal?

10          MR. HOPWOOD:  No, Your Honor.

11          MR. SINGHAL:  No, Your Honor.  Thank you.

12          MS. BELIZAIRE:  Thank you.

13          THE COURT:  Thank you.

14          (Proceedings concluded at 12:15 p.m.)

15          - - - - - - - - - - - - - - - - -

16

17          I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19

20  */S/ Nicole Sesta, RMR, CRR*
    *Court Reporter/Transcriber*

21

22  *April 25, 2024*
        *Date*

23

24

25