UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

               - against -

JOHN PAPPA,

                   Defendant.
------------------------------------------------------------x

**MEMORANDUM & ORDER**
97-CR-1005 (PKC)

PAMELA K. CHEN, United States District Judge:

Defendant John Pappa ("Pappa" or "Defendant") seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) ("Section 3582(c)(1)(A)"). For the reasons discussed herein, the Court denies that request.

## BACKGROUND

### I. Defendant's Criminal Conduct

Between June 1992 and December 1997, Defendant engaged in drug trafficking and racketeering activities that predominantly involved murder as an associate of the Colombo Organized Crime Family (the "Colombo Family"). (Presentence Report ("PSR"), ¶¶ 20–21, 31, 34–36, 40; Gov't's Opp'n, Dkt. 241, at 1.) Defendant was personally involved in four murders related to his association with the Colombo Family.[1]

In October 1993, as part of a three-man "hit-team" assembled by Eric Curcio ("Curcio"), the head of a crew of "rising associates" of the Colombo Family, Defendant killed high-ranking Colombo Family member Joseph Scopo ("Scopo"). (PSR ¶¶ 17–18, 20.) On October 20, 1993, Curcio, Defendant, and John Sparacino ambushed Scopo as he returned to his residence. (*Id.* ¶ 20.)

---

[1] Additional details about the murders and Defendant's other criminal conduct are set forth in the Presentence Report. (PSR ¶¶ 12-42.)

Although Sparacino sprayed the vehicle that Scopo was in with gunfire, Scopo managed to exit the vehicle and flee on foot. (*Id*.) Defendant pursued Scopo and shot at him, hitting him three times and killing him. (*Id*.) After the Scopo murder, Sparacino began taking credit for the murder even though it was Defendant who had actually killed Scopo. (*Id*. ¶ 22.) This prompted Defendant and Curcio to agree that Sparacino had to be killed so that Defendant and Curcio could claim credit for the Scopo killing. (*Id*.) Although there was at least one failed attempt to kill Sparacino thereafter, the plan to kill Sparacino did not come to fruition until August 1994. (*Id*. ¶ 35.)

In the meantime, in June 1994, Defendant and Curcio worked together to murder one of Sparacino's close friends, Rolando Rivera ("Rivera"), because Rivera had revealed to his girlfriend a warning that Curcio had given Rivera about staying away from Sparacino, which suggested that Sparacino might soon be killed. (*Id*. ¶¶ 26–28.) When Curcio advised Defendant about Rivera's act of indiscretion, the two men agreed that Rivera had to be killed. (*Id*. ¶ 28.) Defendant and Curcio arranged a meeting with Rivera, and on June 7, 1994, the three men drove together in a stolen van to Staten Island. (*Id*. ¶¶ 29–31.) Just after the van crossed into Staten Island, Rivera was shot four times. (*Id*. ¶ 31.) Defendant and Curcio then pushed Rivera, who was still alive, out of the moving van. (*Id*.) Though Rivera was found alive that night by an off-duty police officer, he died a short time later. (*Id*.)

In July 1994, the plan to kill Sparacino was revived after it was reported to Curcio that Sparacino had openly disparaged Defendant and Curcio at a night club about the two men taking credit for the Scopo murder. (*Id*. ¶¶ 32–33.) After learning of this incident from Curcio, Defendant solicited his friend, Calvin Hennigar[2] ("Hennigar"), who had assisted Sparacino in distributing

---

[2] Defendant and Hennigar were partners in a retail drug business that distributed large quantities of marijuana, cocaine, and ecstasy between June 1992 and December 1997. (*Id*. ¶¶ 2, 41, 43.)

drugs on Staten Island, to help kill Sparacino.  (*Id.* ¶ 34.)  On August 13, 1994, Hennigar lured

Sparacino to Hennigar's Staten Island home, where Hennigar shot Sparacino in the back of the

head, killing him.  (*Id.* ¶ 35.)  Two days later, Defendant and Hennigar transported Sparacino's

corpse in a stolen car to another location in Staten Island and set the car on fire.  (*Id.* ¶ 36.)  An

autopsy later revealed that Sparacino had been hog–tied and his body mutilated; a flap of skin had

been cut from Sparacino's face and his penis had been severed and placed in his mouth.  (*Id.*)

In October 1994, after suspecting that Curcio had not properly credited Defendant for the

Scopo killing and that Curcio might have killed one of Defendant's close friends who had been a

member of Curcio's crew, Defendant killed Curcio.  (*Id.* ¶¶ 37–39.)  Defendant initially but

unsuccessfully tried to recruit several organized crime associates to assist with Curcio's murder,

leaving Defendant to murder Curcio alone.  (*Id.* ¶ 40.)  On October 4, 1994, Defendant ambushed

Curcio at his place of business, shooting him more than ten times in the face, chest, and hand,

killing him.  (*Id.* ¶ 40.)

## II.    Defendant's Convictions and Sentence

On December 30, 1997, Defendant was indicted in a superseding (S-1) indictment on

eleven felony counts: (1) Racketeering, in violation of 18 U.S.C. § 1962(c);[3] (2) Racketeering

Conspiracy, in violation of 18 U.S.C. § 1962(d); (3) Conspiracy to Commit Murder in Aid of

Racketeering (Scopo), in violation of 18 U.S.C. § 1959(a)(5); (4) Murder in Aid of Racketeering

(Scopo), in violation of 18 U.S.C. § 1959(a)(1); (5) Possession and Use of Firearm in the

Commission of a Violent Crime (Counts 3 and 4), in violation of 18 U.S.C. § 924(c)(1); (6)

Conspiracy to Commit Murder in Aid of Racketeering (Curcio), in violation of 18

---

[3] The murders of Scopo, Rivera, Sparacino, and Curcio were charged as predicate acts for
the racketeering offense charged in Count 1.

3

U.S.C. § 1959(a)(5); (7) Murder in Aid of Racketeering (Curcio), in violation of 18 U.S.C. § 1959(a)(1); (8) Possession and Use of Firearm in the Commission of a Violent Crime (Counts 6 and 7), in violation of 18 U.S.C. § 924(c)(1); (9) Conspiracy to Distribute and Possess With Intent to Distribute Cocaine, Marijuana, and MDMA, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A); (10) Distribution and Possession with Intent to Distribute Cocaine, Marijuana, and MDMA, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A); and (11) Felon in Possession of a Weapon, 18 U.S.C. §§ 922 (g)(1), 924(a)(2). (*See* S-1 Indictment, Dkt. 13; PSR ¶¶ 2–5; Judgment, Dkt. 188, at ECF[4] 1–2.)

In May 1999, Defendant was convicted at trial on Counts 1 through 10,[5] including the two counts of murder in aid of racketeering, all related to his role in the Colombo Family. (PSR ¶¶ 1–5.) In November 1999, Defendant was sentenced to six concurrent life sentences, one on each of the two racketeering counts and the two murder counts, one on the drug trafficking count, and one on the drug trafficking conspiracy count. (Judgment, Dkt. 188, at ECF 3.) Defendant also received concurrent sentences of ten years on the two murder conspiracy counts and consecutive sentences of five and 20 years on the two firearm counts. (*Id.*)

## III.    Defendant's Motion for Compassionate Release

Defendant filed his motion for compassionate release on December 19, 2022, when the case was still assigned to the Honorable Raymond J. Dearie. (Dkt. 238.) The government filed its opposition to the motion on January 13, 2023, and Defendant filed his reply on January 15, 2023, and a supplemental memorandum on October 2, 2023. (Dkts. 241–243.) After the case was

---

[4] "ECF" refers to the pagination generated by the Electronic Court Filing system ("ECF") (located in the upper right corner of the document) and not the document's internal pagination.

[5] The felon in possession charge in Count 11 was severed before trial. (PSR ¶ 1.)

reassigned to the undersigned, Defendant filed a second supplemental memorandum on November 21, 2023.  (Dkt. 244.)  In addition, the Court has separately received copies of the victims' communications with the government, prison records showing Defendant's ongoing relationships with alleged members of the Colombo Family, and a letter submitted under seal and *ex parte* on behalf of one of the former prosecutors and two former investigators responsible for this case (the "prosecution team").[6]  (Dkts. 245, 251, 252.)  Defendant was provided a copy of the prosecution team's *ex parte* letter and filed a sealed response on May 28, 2024.  (Dkt. 255.)

On April 23, 2024, the Court held oral argument on Defendant's motion ("April Proceeding").  (4/23/2024 Min. Entry.)  In advance of the April proceeding, the Court advised the parties that "[i]n addition to [] addressing the arguments in their motion briefing regarding the 'extraordinary and compelling reasons' asserted by Defendant in support of his motion, as well as the [18 U.S.C. § 3553(a) (the 'Section 3553(a)'] factors, the parties should be prepared to argue what an appropriate sentence would be in the event the Court finds that a sentencing reduction is warranted under 18 U.S.C. Section 3582(c)(1)(A)."  (1/2/2024 Scheduling Order.)  Although not a formal resentencing, the Court also directed "the Government to ensure that the victims of Defendant's crimes are notified of the proceeding, and further advised that they will be given an opportunity to speak at the proceeding should they wish to do so."[7]  (*Id.*)  At the April proceeding,

---

[6] Though filed *ex parte*, the prosecution team consented to the disclosure of their letter to Defendant's counsel.  The Court notes that it has not relied on the prosecution team's submission in deciding this motion.

[7] *See* U.S.S.G., Supp. to App. C, Amendment 814, at 210 (U.S. Sent'g Comm'n 2023) ("Although [Section] 3582(c)(1)(A) does not require a court to conduct a public court proceeding before resolving a motion, and in many cases the passage of time can make victim identification and notification difficult, the Commission encourages the court to make its best effort to notify any victims and, to the extent public court proceedings are held, afford them an opportunity to be heard, unless the victim previously requested not to be notified.").

both sides presented arguments about whether Defendant had made a sufficient showing to warrant a sentence reduction under Section 3582(c)(1)(A) and the Section 3553(a) factors, and four victims spoke about the impact of Defendant's crimes on them and their opposition to Defendant's release from prison.  (Transcript of 4/23/24 Oral Argument ("Tr."), Dkt. 253.)  The Court reserved judgment on the motion, which it now decides.  (*Id*. at 69–70.)

## DISCUSSION

Defendant asks the Court to grant him a sentence reduction under Section 3582(c)(1)(A) based on what he argues are "extraordinary and compelling circumstances":  (1) his upbringing and youth at the time he committed the crimes of conviction; (2) the fact that a life sentence in his case will be unusually long given his young age at the time of his convictions, which, in turn, "creates a sentencing disparity" when compared to "nationwide sentencing practices for those convicted of murder in federal court"; (3) the sentencing court's inability to consider the mitigating circumstances of Defendant's youth and upbringing because of the mandatory Sentencing Guidelines that applied at the time of Defendant's sentencing; and (4) Defendant's extraordinary rehabilitation while incarcerated.  (Def. Compassionate Release Motion ("Mot."), Dkt. 238, at 8.)

## I.    Legal Standard

### A.    Compassionate Release After the First Step Act

"As part of the First Step Act of 2018, Congress authorized courts to consider an inmate's motion for a discretionary sentence modification for 'extraordinary and compelling reasons,' often colloquially called a motion for compassionate release." *United States v. Saladino*, 7 F.4th 120, 121 (2d Cir. 2021) (per curiam) (quoting Pub. L. No. 115–391, § 603(b), 132 Stat. 5194, 5239). Still, "compassionate release is a misnomer." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020).  "[Section] 3582(c)(1)(A) in fact speaks of sentence reductions.  A district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of

imprisonment but impose a significant term of probation or supervised release in its place." *Id.*
"Beyond this, a district court's discretion in this area—as in all sentencing matters—is broad." *Id.*
"The only statutory limit on what a court may consider to be extraordinary and compelling is that
'rehabilitation *alone* shall not be considered an extraordinary and compelling reason.'" *Id.* at 237–
38 (cleaned up) (quoting 28 U.S.C. § 994(t)).[8]  Under Section 3582(c)(1)(A)(i), therefore, a court
"may reduce [a] term of imprisonment . . . if it finds that [] extraordinary and compelling reasons
warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i).

While "[a] court deciding a compassionate release motion can consider 'the full slate of
extraordinary and compelling reasons that an imprisoned person might bring before [it,]'. . . there
are three requirements that must be satisfied before a court can grant such relief." *United States
v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021) (internal citations omitted).  "First, absent waiver or
forfeiture by the government, an inmate must exhaust administrative remedies by requesting such
relief from prison authorities."[9]  *Id.*  "Second, a court must 'consider[ ] the factors set forth in
[Section] 3553(a) to the extent that they are applicable.'" *Id.* (internal citations omitted).  "Third,
the inmate must demonstrate that his proffered circumstances are indeed 'extraordinary and
compelling' such that, in light of these [Section] 3553(a) factors, a sentence reduction is justified

---

[8] The Second Circuit has also made clear that a defendant's potential actual innocence does
not constitute an extraordinary and compelling reason under Section 3582(c)(1)(A), and that a
sentencing disparity between defendants who pleaded guilty (and sometimes cooperated with the
government) and those who went to trial usually does not constitute an extraordinary and
compelling reason.  *See United States v. Fernandez*, 104 F.4th 420, 428-29 (2d Cir. 2024).

[9] Section 3582(c)(1)(A) requires a defendant to fully exhaust his administrative remedies
with the Bureau of Prisons ("BOP") before applying for relief from the court.   18
U.S.C. § 3582(c)(1)(A).  Defendant has satisfied this requirement based on the rejection of his
compassionate release request by FCI Hazelton's warden.  (*See* 10/28/2020 Warden Ltr., Dkt. 869-
14); *United States v. Rivera*, No. 89-CR-0346 (LAP), 2021 WL 5235093, at *4 (S.D.N.Y. Nov. 9,
2021) ("Because of the Warden's denial of Defendant's request for compassionate release,
Defendant has exhausted his administrative remedies.") (internal citations omitted).

under [Section] 3582(c)(1)(A) and would not simply constitute second-guessing of the sentence previously imposed." *Id.* (internal citations omitted).

**B.    Consideration of the Section 3553(a) Factors Alone Can Be Sufficient**

As discussed *supra*, even where a movant demonstrates extraordinary and compelling reasons, the court must consider whether the sentencing factors set forth in Section 3553(a) also support release.  *See United States v. Applewhite*, No. 17-CR-0142 (MKB), 2020 WL 7356615, at *3 (E.D.N.Y. Dec. 15, 2020) (citing *United States v. Roney*, 833 F. App'x 850, 853 (2d Cir. 2020) (summary order)).   Indeed, because "a finding of extraordinary and compelling reasons is necessary, but not sufficient, to grant a defendant's motion for compassionate release[,] . . . when a district court denies a defendant's motion under [Section] 3582(c)(1)(A) in sole reliance on the applicable [Section] 3553(a) sentencing factors, it need not also determine whether the defendant has shown extraordinary and compelling reasons that might (in other circumstances) justify a sentence reduction."  *Keitt*, 21 F.4th at 69 (noting holding's consistency "with decisions of our sister Circuits") (citing *United States v. Jones*, 17 F.4th 371, 374 (2d Cir. 2021)); *see also Roney*, 833 F. App'x at 853 (finding it unnecessary to determine whether appellant had shown extraordinary and compelling reasons under Section 3582(c)(1)(A)(i) "because, even assuming *arguendo* that he has, we discern no abuse of discretion in the district court's conclusion that release is nevertheless unwarranted upon consideration of the [Section] 3553(a) factors").

**II.    The Section 3553(a) Factors Do Not Support a Sentence Reduction**

The Court finds applicable, and considers, the following Section 3553(a) factors in deciding Defendant's motion for compassionate release: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense[,] (B) to afford adequate deterrence to criminal conduct[, and] (C) to protect the public from further crimes of the defendant; . . . and (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a); *see United States v. Mattes*, Nos. 20-2349-CR, 20-2511-CR, 2022 WL 260395, at *2 (2d Cir. Jan. 28, 2022) (summary order) ("[W]e have never required a district court to 'address every argument the defendant has made or discuss every [Section] 3553(a) factor individually.'" (quoting *Keitt*, 21 F.4th at 72 (in turn, quoting *United States v. Rosa*, 957 F.3d 113, 119 (2d. Cir. 2020)))).

With respect to the Section 3553(a) factors, Defendant relies on the same facts underlying his showing of "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i), namely: (1) his upbringing and youth at the time of his crimes, (2) his extensive time already served, and (3) his remarkable rehabilitation. (Mot., Dkt. 238, at 20–25.) Defendant argues, in sum and substance, that "[t]he [Section] 3553(a) sentencing factors support a reduction in sentence here because Pappa was less culpable than a normal defendant, has already served 25 years of imprisonment, and, if released, he will be a productive and law-abiding citizen." (*Id.* at 20.) While acknowledging the seriousness of the crimes he has committed, Defendant argues that "committing murder does not mean that the severity of and nature of the crime always prevails over other Section 3553(a) considerations." (*Id.* at 20.) As discussed below, the Court disagrees. The Court finds that the mitigating facts and sentencing factors on which Defendant relies do not outweigh the gravity and depraved nature of the four murders that he was personally involved in or directly committed. The Court also finds that a life sentence is not greater than necessary to comply with the purposes of sentencing, in particular the need for the sentence to reflect the seriousness of, and provide just punishment for, Defendant's crimes. Finally, the Court finds that a life sentence in

this case would not result in an unwarranted disparity when compared to other cases involving multiple murders.

At the outset, the Court acknowledges the inherent and extreme difficulty of deciding what an appropriate sentence is in a case such as this, where the defendant is responsible for four murders, and yet, over the last 25 years of his incarceration, has achieved a measure of rehabilitation and demonstrated the potential to be a productive member of society. While the Court must consider these competing sentencing factors under Section 3553(a), they do not map onto one another nor cancel each other out. In the end, the question is which way the scales of justice tip when these competing factors are weighed against each other.

**A.    Nature and Circumstances of Defendant's Offenses and His Personal History and Characteristics[10]**

The four murders committed by Defendant were brutal and senseless. Defendant killed Sparacino and Curcio for taking credit, or possibly taking credit, for a murder that Defendant had committed and wanted credit for, and Defendant killed Rivera for a single act of indiscretion. Defendant's conduct in ordering and/or carrying out the four murders was unusually cold-blooded, calculating, and ruthless. The murders of Rivera and Sparacino, in particular, demonstrate unusual depravity and cruelty, and in the case of Sparacino, sadism. Rivera was shot multiple times and then thrown from a moving vehicle while still alive. Sparacino was not only shot in the back of

---

[10] The Court recognizes that "evidence of postsentencing rehabilitation may plainly be relevant to 'the history and characteristics of the defendant,'" *United States v. Rodriguez*, 492 F. Supp. 3d 306, 314 (S.D.N.Y. 2020) (quoting *Pepper v. United States*, 562 U.S. 476, 491 (2011)), and discusses Defendant's rehabilitation *infra*. The Court has also considered Defendant's personal history and characteristics in assessing the need for specific deterrence, *infra*. Finally, the Court notes that the applicable sentencing range under the Sentencing Guidelines is life for Counts 1–4, 6, 7, 9, and 10; a mandatory consecutive five-year term for Count 5; and a mandatory consecutive 20-year term for Count 8. 18 U.S.C. § 3553(a)(6).

the head, but he was hog-tied, a flap of skin was cut off his face, and his penis was severed and placed in his mouth.

The depravity of Defendant's conduct with respect to Sparacino's murder is heightened by Defendant's close relationship with the Sparacino family at the time of the murder and Defendant's continued relationship with the family after the killing, as the family mourned their loss and the search for Sparacino's killer ensued. At the April proceeding, Sparacino's mother tearfully berated Defendant's "cruel and barbaric actions," explaining that Defendant "sat at my table on many occasions and was treated as a family member. He actually looked me straight in the eye and expressed concern and confusion about my son's disappearance knowing full well the atrocities he committed; the location of his mutilated body." (Tr., Dkt. 253, at 4:22–5:3.) Sparacino's cousin described Defendant and his conduct this way:

> The man who murdered my cousin was charming and personable. He was also devious and cunning. He used these traits to keep himself close to my Aunt Rose [Sparacino's mother] and my cousin, Sal [Sparacino's brother], knowing full well the atrocity he had committed.
>
> While our family searched for my cousin, John [Sparacino], his killer was in my aunt's house pretending to aid the search. When [Sparacino's] body was found in a horrific state, his killer remained close to my cousin, Sal, never showing a moment of guilt or remorse over what he had done, only caring if any suspicion was on him. He sat at my aunt's table knowing the vicious and brutal way that he had killed [her] son.

(*Id*. at 5:22–6:7.)

Defendant argues that his youth—he was 19 years old when he committed all four murders—immaturity, and "upbringing in a family of organized crime" make him less culpable than the "run-of-the-mill murder defendant." (Mot., Dkt. 238, at 20.) The Court disagrees.

Defendant's own actions demonstrate that he was in full control of his decision-making faculties and that he pursued his goal of advancing within the Colombo Family with ruthless and

11

callous viciousness. In particular, Defendant's ability to plan and execute Sparacino's murder—in the most heinous and degrading manner—and then conceal it, all while maintaining a close relationship with Sparacino's grieving family, demonstrates a degree of sophistication, calculation, and cunning that is not indicative of being an impressionable or misguided youth, as Defendant attempts to portray himself. Although Defendant might simply have been following orders when he killed Scopo, he was in charge of and directed the three subsequent murders. Indeed, by the end of the murder spree, Defendant was the only one of the original three-man hit team left standing—thanks to Defendant himself. By killing Curcio, Defendant ensured there was no one older, wiser, and more culpable than he himself.

Furthermore, Defendant's claim that his actions were borne of a misguided belief that this was "what [he] was supposed to do" because his father was "such a great man" is belied by the fact that Defendant knowingly joined the crime family that had *killed* his father—something that Defendant sought to explain at the April proceeding by suggesting that he did not really know what had happened to his father. (Tr., Dkt. 253, 64:12–18, 65:3–4.) But this claim is not credible. Defendant even aligned himself with the crime family that killed his father "[b]ecause [he] thought [he] was going to do this better than [him.]" (Tr., Dkt. 253, 64:16–17.)[11]

---

[11] The Court acknowledges that this statement, which Defendant made at the April proceeding, was part of a longer response to the Court's question about why he joined the organization that had killed his father, to which Defendant responded: "Because I thought I was going to do this better than my dad and that's what I was supposed to do and that's what I was in line to do. You get your beliefs from what people tell you, and from what you hear, see, and think is expected of you. And that's what I did. I believe wholeheartedly that this was expected of me." (Tr., Dkt. 253, at 64:14–19.) Defendant also explained that he "never got to hear what really happened with [his] dad as a kid." (*Id.* at 65:1–2.) However, this statement is contradicted by the defense's own assertion that, "people would maliciously tell [Defendant] the real story [about how his father died], even though he was just a child." (Mot., Dkt. 238, at 3; *see* Ltr. of Def.'s sister, Dkt. 238-1, at ECF 54 ("Much to [our mother's] chagrin and our detriment, we were confronted with the truth, often maliciously, many times during the course of our childhood. What made it worse was that we were surprised by the truth – unprepared.").) Furthermore, Defendant was 17

12

The Court recognizes that youth can be a mitigating factor with respect to a defendant's culpability.  *See United States v. Ramsay*, 538 F. Supp. 3d 407, 424 (S.D.N.Y. 2021) (reducing defendant's sentence under Section 3582(c)(1)(A) largely because of his youth at the time of the offense, emphasizing that, as an 18-year-old, defendant's "decision to fire into a crowd ha[d] all the hallmarks of adolescent crime: a split-second, hot-headed choice made in the presence of peers"); (Mot., Dkt. 238, at 10 (citing studies showing that brain development does not finish until a person's mid-20s)).  But Defendant's actions demonstrate that he was not an immature 19-year-old when he committed the four murders, but tragically was already a hardened and determined would-be mobster who understood the gravity of his actions and the grievous harm he was inflicting on the victims and their families, especially the Sparacinos, and yet chose to commit the murders to further his own goal of joining the Colombo Family.  Though the murders Defendant committed might seem senseless to the average person, they make sense in the organized crime world where murder and violence are the currency—something that Defendant understood and accepted at a young age.

The devastation caused by Defendant's crimes also cannot be understated.  Although it has been over 30 years since the murders, the extreme trauma the victims' family members—all of whom vehemently oppose Defendant's release from prison—expressed at the April proceeding, and continue to feel, was palpable and raw.

---

when he joined the war between "the two factions of the Colombo family."  (Mot., Dkt. 238, at 2.) At that point, Defendant surely knew that his father, who was a member of the Genovese crime family, was killed by members of the Colombo Family in connection with a drug-related murder Defendant's father had committed.  (*Id*. at 3.)  This was two years before Defendant committed four murders for, or as part of his association with, the Colombo Family.  Therefore, as discussed *supra*, the Court does not accept Defendant's post-hoc explanation that he was driven to commit the four murders by misguided beliefs about what was expected of him as his father's son or because of "brainwashing by older, ill-intentioned, manipulative, self-aggrandizing and threatening criminals."  (Ltr. of Def.'s sister, Dkt. 238-1, at ECF 53.)

As Sparacino's mother said that day in court:

My eldest son was 24 years old when he was executed. The defendant savagely mutilated his body and placed him in a car, which he then set on fire. Such depraved indifference to human life shouldn't be rewarded with an early release. *My family has received and will continue to endure life sentences without any chance of reprieve from this endless grief and senseless loss.*

My grandchildren will never have an uncle. My youngest son will never have his brother back, and my heart and mind have never been -- have been irrevocably damaged by the defendant's cruel and barbaric actions.

\* \* \*

The defendant's release would impact the entire family. My peace of mind would be shattered knowing that he was back in society and in the position to potentially threaten, hurt, and maim my only living son and grandchildren. I implore you to put a stop to this for early release. I ask that you put yourself in my shoes only for a moment. If the defendant did [to] your son or daughter what he did to mine, would you be inclined to set him free? I hate you.

(Tr., Dkt. 253, at 4:12–5:15 (emphasis added); *see also* Victim Impact Ltr. from Sparacino's mother, Dkt. 245, at ECF 2; Victim Impact Ltr. from Sparacino's brother, Dkt. 251, at ECF 2.)

Sparacino's cousin expressed similarly intense emotions and enduring trauma:

In the three decades since John was murdered, it's hard to remember him separate from the circumstances of his death. I am haunted by the details of what so inhumanely was done to him. I force myself to remember the softness of his face, how incredibly blue his eyes were, or the slight lisp in his voice that always reminded me of the little boy he once was.

\* \* \*

His life has value and meaning and I miss him terribly. *The day John was brutally murdered, his family received a life sentence that we will never get any relief from.* There's not a second chance for John. After 30 years, there will be no trips to Disney, walks on the beaches, he'll never be able to share another holiday with us, dance at his nephew's wedding. He will not be there to hold his mother's hand when she's ill.

\* \* \*

14

He will never experience the countless hopes and dreams we had for him. One person is responsible for the everlasting grief John's family suffers. To give this man a second chance is to allow a vicious and brutal murderer back into society. To give him the opportunity to experience all that he robbed John and his family of is undeserved.

(Tr., Dkt. 253, at 6:14–20; 7:1–8; 7:18–23.)[12]

Rivera's former girlfriend also spoke very emotionally about the lasting impact of Rivera's killing on her, breaking down at various points:

I was five months pregnant starting a life, expecting to have a life with someone that was my soulmate, the love of my life. . . .

I had a child that never got to see, smell, hear, feel the love of the real father. . . . My life was taken on that day, June 8, 1994. . . . My life was taken. I was never the same and I'll never be the same.

Ripped from my life, taken out like trash, thrown on a highway, like garbage. . . . Here one day, gone the next. I didn't cry. I went into shock. I spent my whole pregnancy messing up, walking alone, looking up at the stars saying how is this happening, how am I having a baby from a dead man that I had plans with. . . .

After that, I couldn't hold my child. I couldn't love my child because she looks so much like her father, and I couldn't bring myself to let that love come out because I was afraid of losing another one because I felt in order for her to be here, he had to die. To give a life, they take a life.

So I had a child with her father ripped from her from the day she was born, from before, and I had to live a mental case for years and years and years with numerous breakdowns and rage and anger, replaying everything that was said to me that night, replaying it in my head over and over. How could I have saved him? Why did he go? Why?

Why couldn't I tell him that I didn't want him to go? What was making him go? Why? All these questions. Why? Why? Why? But my biggest question is why am I here today? Why? The victims that have been left behind have been left to suffer all these years. Did I ever think I'd be here 30 years later? Did I think from 1994 that I would be sitting here facing you, which I've always dreamed of but knowing that I would never get an answer. Knowing. . . .

---

[12] The Court recognizes that Sparacino participated in, and sought to claim credit for, Scopo's murder. Nonetheless, the devastating impact of Sparacino's death on his family is no less real or meaningful.

You took people's lives and you have ruined us, ruined us that we can't see our loved ones. Our loved ones can never get a life. My child could never feel her father. My child could never see her father, smell him, nothing. You're young enough to have a life and your life should be behind bars. Okay. Like I have felt I've been in a mental prison . . . [f]or 30 years. . . ."

(Tr., Dkt. 253, at 9:7–10:22; *see also* Victim Impact Ltr. of Rivera's former girlfriend, Dkt. 245, at ECF 3–4.)

> **B.     Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment for the Offense, Afford Adequate Deterrence to Criminal Conduct, and Protect the Public from Further Crimes by Defendant**

> 1.     <u>Seriousness of the Offense, Respect for the Law, and Just Punishment</u>

The gravity of the crimes that Defendant committed cannot be overstated.  Defendant directly participated in four planned and pre-meditated executions, two of which involved depraved and cruel conduct, and one of which was sadistic.  A single murder can warrant a life sentence. *See*, *e.g.*, *United States v. Stewart*, No. 02-CR-1435 (LAP), 2025 WL 89298, at *7 (S.D.N.Y. Jan. 14, 2025) (denying compassionate release and finding life sentence appropriate for man convicted of murder); *United States v. Frias*, No. 01-CR-0307-3 (DLC), 2023 WL 2713631, at *1 (S.D.N.Y. Mar. 30, 2023) (denying compassionate release and finding life imprisonment not unreasonable where defendant was convicted of murder); *United States v. Mui*, No. 95-CR-0766 (SJ) (VMS), 2021 WL 10330295, at *9 (E.D.N.Y. July 23, 2021), *R&R adopted*, 2023 WL 1354785 (E.D.N.Y. Jan. 31, 2023) (denying compassionate release for organized crime leader convicted of one murder, among other non-murder convictions).  Premeditation and motivations can render a murder—or murders—even more deserving of a life sentence.  *See United States v. Jackson*, No. 02-CR-0756 (PGG), 2021 WL 4150962, at *4–*5 (S.D.N.Y. Sept. 13, 2021) (finding that Section 3553(a) factors did not warrant reduction of defendant's "in effect" life sentence of 540 months, and citing sentencing judge's reasoning: defendant "deliberately made the decision

that he wanted [a rival drug dealer] killed [and]. . . put in motion . . . that killing," and "how much can even these circumstances in [defendant's] background really mitigate in terms of his punishment the very serious crimes that he committed?  There is no more serious crime . . . then [sic] intentional murder.  And that's what we have here.").  Given the nature and circumstances of Defendant's crimes, including the motivation behind them, the conduct itself, and their devastating impact, a sentence of life is necessary to reflect the extremely serious and heinous nature of Defendant's offenses, to promote respect for the law, and to provide just punishment for the offenses he wantonly committed.

2.     General Deterrence

A life sentence in this case also significantly promotes general deterrence.  As previously noted, murder is an established currency of the organized crime world, which means that only the most severe response to these acts of violence—a life sentence—will deter other potential organized crime participants.  Conversely, releasing a defendant who has committed not one, but four, pre-meditated murders, all for the sake of accessing and climbing the organized crime ranks, would encourage similar ruthless and lawless behavior.  Furthermore, while the Court recognizes that some studies suggest that the length of a sentence after a certain point does not add any further general deterrence, (Mot., Dkt. 238, at 22 (citing studies)), the Court believes that the organized crime world presents a unique cohort because of the calculated, strategic, and sanctioned nature of most mob killings.  In this regard, organized crime defendants can be likened to white collar criminals, who "are capable of calculating the costs and benefits of their illegal activities relative to the severity of punishments that may be imposed." *United States v. Stein*, No. 09-CR-0377 (JBW), 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010), *corrected*, 2010 WL 3023527 (E.D.N.Y. July 27, 2010) (noting that, for this reason, in cases involving white collar crime, "[a]

serious sentence is required to discourage such crimes"). Thus, a life sentence in this case furthers the goal of general deterrence.

### 3.    Specific Deterrence and Need to Protect the Public

However, the need for specific deterrence in this case is less clear. Although the victims' relatives fear retaliation by Defendant, (Tr., Dkt. 253, at 5:9–11,7:23–8:4), and believe that he can never change, (*id*. at 14:19–21), he has put forth substantial evidence of his alleged rehabilitation, including dozens of letters and memoranda of support from family, friends, and even 21 BOP staff members, (*see* Mot., Dkt. 238, at 17; Dkt. 238-1 (Exhibit C); Dkt. 244, at 9; Dkt. 244-1, at ECF 23–25). These submissions attest to Defendant's ability to be responsible and productive, his capacity to be loving and caring, and his professed remorse and desire to make amends. A particularly strong recommendation memorandum was provided by Defendant's BOP Unit Counselor, dated October 21, 2023:

> I am writing this letter of recommendation in professional and character support of John Pappa. I have gotten to know Pappa over the past nine years, both as a Correctional Officer and as his Unit Counselor. In both capacities, I have been most impressed with Pappa's dedication to rehabilitation and his tirelessly exceptional work ethic; to include several different work, safety, and educational programs. I am confident that Pappa will be an exceptional, productive, and outstanding law-abiding citizen upon his release.
>
> In the Victim Impact program, Pappa stood out from the start as an unusually articulate and perceptive participant in class discussions. Pappa's dedication to mastering the program principles and rehabilitation led him to become the coordinator of the Victim Impact class. Pappa's compassionate demeaner reflects a high level of perceptiveness. Pappa's participation in the Victim Impact class is evidence that he has exceptional insight and analytical skills that demonstrate clarity and cogency. Pappa has been the strongest participant in these rehabilitation classes and programs, and a review of his inmate record reveals that his performance in these classes and programs arc evident throughout his incarceration. Pappa is the prime example of what correctional services, rehabilitation, and re-entry preparation's goals are founded upon.
>
> Pappa's self-improvement and transformation, however, do not end there. Pappa is

also a person of great maturity, unusual energy, with excellent interpersonal communication skills. Through Pappa's years of incarceration, he has grown into a genuine and honest person, one of true character. He used his skills and intelligence to maximize his potential and has maintained a clear disciplinary record for 25 years. Pappa is what he appears to be, a consistent and productive model for change.

It is significant that Pappa has taken every step to improve his understanding of the crimes he committed. He accepts that what he did was wrong, and he takes full responsibility for his actions. He has mended and coped with the crimes he has committed and has illustrated genuine remorse. Pappa's strong ties and family support convince me that Pappa has prepared himself to be successful upon release. It is my professional opinion, with all my years of correctional experience, that a man like Pappa has earned the right to be free. I truly know that Pappa will continue to illustrate these behavioral changes and incorporate those principles to helping others. It is with my strongest recommendation, that Pappa be given a second chance.

(Dkt. 244-1, at ECF 23–25.) Other memoranda submitted by BOP staff and other letters of support are similarly glowing and effusive about Defendant's rehabilitation and his ability to re-enter society and lead a productive and law-abiding life. (*See* Mot., Dkt. 238, at 17–19 (excerpting portions of BOP staff and former inmate letters).)

Defendant has also written to the Court, and spoke at the April proceeding, about how he is a changed person and has "rediscovered [his] humanity and become empathic." (12/18/22 Email from Defendant written to Judge Dearie, Dkt. 238–1, at ECF 52.) In his December 18, 2022 email to Judge Dearie, Defendant wrote: "I deeply apologize to my victims, their families, society, and also to you." (*Id.*) In his subsequent email to the Court after this case was reassigned to the undersigned, Defendant similarly wrote, *inter alia*:

Ultimately realizing how deeply my father's murder impacted me -- which in turn -- helped me understand the lasting pain and grief I caused my victims and their families. Darkness set in further and I despised my current self. I'm ashamed of my actions and I will always feel deep guilt and sorrow for those my crimes affected.

Empathy entered my life and I rediscovered my humanity. The darkness in prison can smother you. When burdened with a life-sentence you must find purpose. I

made a conscientious decision to change my lifestyle and to make amends. First, I needed to rebuild my self-esteem. I couldn't respect myself if I continued to harm others or poison them with drugs. So I set goals and diligently attained them. Voltaire said, "We must not be guilty of the good we did not do." Your Honor, I am devoted to giving back.

                              *    *    *

I cannot change the past or right my wrongs, but I continually make amends by living differently and helping people learn from the errors of my past.

(Dkt. 244–1, at ECF 26–27.)

Defendant's sentencing submission also includes voluminous documentary evidence of his participation and leadership roles in a myriad of programs at the prison. These activities include: (1) serving as a "Victim Impact Facilitator, who promotes acceptance of responsibility, genuine remorse, empathy, and making amends"; (2) serving as a "Mental Health Companion, a trained inmate who provides assistance and support to inmates with mental illness under the direction of the Psychology Services Department"; and (3) his creation of 22 self-improvement courses that Defendant taught to other inmates. (Mot., Dkt. 238, at 17.) Collectively, this evidence strongly supports Defendant's argument that he has achieved extraordinary rehabilitation.

Nonetheless, the Court is not convinced that Defendant is fully rehabilitated to the extent that true rehabilitation requires being remorseful for one's criminal acts and understanding the gravity of that conduct and the grievous harm that it has caused others. Here, the Court does not find that Defendant feels, as he claims, genuine remorse for his crimes or empathy for the victims' families, that he fully appreciates or accepts how heinous his crimes were, or that he actually wants to make amends for the crimes he has committed. Defendant continues to shift blame away from his own premeditation and ambition and onto a "desire for acceptance and belonging [that] made [Defendant] surrender [his] loyalty, and succumb to blind-obedience." (Dkt. 244–1, at ECF 26.) In his letter to this Court, Defendant further distances himself from his actions: "I now realize that

20

I acted out a part contrary to my natural temperament, which led to the crimes that resulted in my arrest and conviction." (*Id.*) Furthermore, the Court struggles to credit as genuine Defendant's verbal statements of contrition and self-discovery given during the April proceeding. Despite the effusive—indeed, genuine—letters of support and Defendant's own sincere-sounding letters, the Court cannot shake the impression, after observing and listening to Defendant over the course of the two-hour April proceeding, that he feels no remorse about committing the four murders nor empathy for the victims or their families. Defendant's statements at the April proceeding felt hollow and performative, admittedly impressions that cannot be conveyed in the typewritten transcript.[13] What the transcript does show, however, is the absence of any direct apology to the victims.[14] The only people he apologized to "from the bottom of [his] heart" for "ruin[ing] their lives" were his sister and mother. (Tr., Dkt. 253, at 67.) During the April proceeding, the Court could not discern any remorse in Defendant's demeanor, body language, or facial expression that demonstrates full rehabilitation.[15]

---

[13] Indeed, the angry reaction of Sparacino's brother to Defendant's statements at the hearing—"And the Oscar goes to you"—did not strike the Court as entirely off the mark.

[14] The Court certainly understands that people process guilt and shame in different ways, and that some people, when confronted face-to-face by the people they have wronged, cannot directly express their remorse and regret, or cannot look them in the eye, because the guilt and shame are so great. But Defendant's appearance and behavior over the two-hour April proceeding did not resemble that.

[15] Indeed, the Court's impression of Defendant from the April proceeding serves to undercut his argument about having committed the murders because of his misguided upbringing and being an impressionable 19-year-old. Rather, the Court came away from the hearing feeling that Defendant was the same person he was at 19, i.e., a man who was proud of his Colombo Family association and did not regret killing four people to further his goal of joining and moving up in the criminal organization that killed his father. (Tr., Dkt. 253, at 64:16-18 (explaining that he joined the organization that killed his father because he "was going to do this better than [his] dad").)

With respect to the risk of recidivism, the Court also has concerns about Defendant's ongoing relationships with organized crime family members even while in prison, which has included receiving money from these individuals.  (*See* Govt. Ltr., Dkt. 251 (transmitting BOP records "evidencing Defendant's continued relationships with members of the Colombo Organized Crime Family"); Tr., Dkt. 253, at 41:5–47:22 (government identifying various crime family members with whom Defendant maintains a relationship), 52:9–53:16 (defense explaining why Defendant has maintained some of these relationships), 54:15–55:11 (same).)  The broader question posed to Defendant and his counsel at the April proceeding as to whether Defendant's continued relationships with these individuals reflect an attitude that is inconsistent with being a "changed man" went largely unanswered.  (Tr., Dkt. 253, 55:20–23, 63:18–69:20.)

In sum, as discussed *supra*, even extraordinary rehabilitation is insufficient to justify a reduced sentence under Section 3582(c)(1)(A)(i).  *See Brooker*, 976 F.3d at 237–38.  Here, the Court finds that Defendant is not fully rehabilitated.  Nonetheless, the Court does not believe that Defendant is likely to recidivate, if only because he does not want to return to prison and shrewdly understands that he would be closely monitored if released from prison.  But perhaps this case demonstrates the ways in which rehabilitation and recidivism can part ways.  While Defendant has demonstrated the ability and discipline to lead a law-abiding and productive life if he so chose to, he has not demonstrated full rehabilitation.  The Court therefore finds that the need for specific deterrence neither weighs in favor of nor against a life sentence.

## III.    Need to Avoid Unwarranted Disparities Between Similarly Situated Defendants

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  This is perhaps the most difficult sentencing factor to weigh.  Since the

First Step Act's passage, there have been a multitude of decisions granting and denying compassionate release requests, such that both the prosecution and defense can marshal decisions supporting their position on this factor.  However, the reality is that it is difficult, if not impossible, for the Court to know whether the circumstances of any particular case are comparable to the case before it because of the myriad facts and considerations—beyond the defendants' criminal conduct and record—that go into every sentencing decision.

Still, the Court notes that the majority of murder cases in which compassionate release was granted do not involve multiple murders.[16]  The cases of *United States v. Rios*, No. 3:94-CR-0112 (JBA), 2020 WL 7246440 (D. Conn. Dec. 8, 2020) and *United States v. Morales*, No. 94-CR-0112 (SRU), 2020 WL 4926609 (D. Conn. Aug. 20, 2020) illustrate how courts have evaluated the sentencing factors differently in cases involving one versus multiple murders.  Both Rios and Morales were members of the Latin Kings gang; Morales was a senior member.  *Rios*, 2020 WL 7246440, at *1, *6; *Morales*, 2020 WL 4926609, at *3.  In 1995, both men were convicted of a slate of racketeering charges and violent crimes.  *Rios*, 2020 WL 7246440, at *1; *Morales*, 2020 WL 4926609, at *1.  Importantly, Rios was convicted of a single murder while Morales was convicted of three.  *Rios*, 2020 WL 7246440, at *1; *Morales*, 2020 WL 4926609, at *1.  The judge in Rios's case granted Rios's compassionate release motion whereas the judge in Morales's case

---

[16] In fact, most of the cases in which compassionate release is granted do not involve murder at all.  More often, these cases involve non-violent, drug-related crimes.  *See, e.g.*, *United States v. Cantu-Rivera*, No. 89-CR-0204, 2019 WL 2578272, at *1 (S.D. Tex. June 24, 2019) (possession with intent to distribute cocaine); *United States v. Millan*, No. 91-CR-0685 (LAP), 2020 WL 1674058, at *1–2 (S.D.N.Y. Apr. 6, 2020) (possession with intent to distribute heroin); *United States v. Torres*, 464 F. Supp. 3d 651, 652–53 (S.D.N.Y. 2020) (drug-related and criminal enterprise crimes); *United States v. Fisher*, 493 F. Supp. 3d 231, 232–33 ("conviction on charges related to a sprawling narcotics conspiracy"); *United States v. Monsanto*, No. 87-CR-0555 (LAP), 2021 WL 355049, at *1 (S.D.N.Y. Feb. 2, 2021) (racketeering, narcotics conspiracy, participation in a continuing criminal enterprise, firearm possession, and federal income tax evasion).

denied his. *Rios*, 2020 WL 7246440, at *6; *Morales*, 2020 WL 4926609, at *4. In distinguishing Rios and Morales, the judge in Rios's case stated, "[w]hile taking one person's life is morally reprehensible, killing three bespeaks a level of depravity that distinguishes Mr. Morales's crimes from those of Mr. Rios and warrants different consideration in the balancing of compassionate release factors." *Rios*, 2020 WL 7246440, at *6; *see also United States v. Wright*, No. 15-CR-0445-3 (PAE), 2022 WL 134870, at *5–*6 (S.D.N.Y. Jan. 13, 2022) (denying compassionate release for defendant who had directly participated in two murders); *United States v. Brown*, No. 94-CR-0631 (SHS), 2021 WL 5051648, at *3 (S.D.N.Y. Nov. 1, 2021) (denying compassionate release motion, as "[t]he number of murders and attempted murders in which [the defendant] played a key role underlines the grave 'nature and circumstances' of the offense, as well as its extreme seriousness").

Here, Defendant argues that a life sentence in his case would result in "gross sentence disparity" when compared to other cases involving one or more murders. (Def. Reply, Dkt. 242, at 7; Def. Second Supp. Br., Dkt. 244, at 6–7.) This argument is unavailing.

First, Defendant cites U.S. Sentencing Commission statistics showing that, between 2015 and 2021, the average length of a sentence for a murder conviction was 262 months,[17] and argues that, he has, "in effect, . . . served a 30-year prison sentence,[18] already longer than the average sentence length for a murder in federal court." (Def. Reply, Dkt. 242, at 7; *see also* Mot., Dkt.

---

[17] The Court notes that for Fiscal Year 2024, the average length of sentences for murder cases was 274 months and the median length was 240 months. *Interactive Data Analyzer*, U.S. Sentencing Comm., https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited May 16, 2025). The website explains that "[s]entences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively." *Id*.

[18] Part of Defendant's "unwarranted disparity" argument is based on Defendant having committed the murders at such a young age, which is likely to result in a longer "life" sentence for him than for most defendants. (Mot., Dkt. 238, at 8.)

238, at 13 (arguing that Defendant's effective sentence will be 56 years if he reaches the age of 79).)  However, this is false equivalency since the cited statistic does not differentiate between cases involving one murder and those involving multiple murders.  Furthermore, the Court finds this single data point regarding the average length of a murder sentence almost meaningless: it does not reflect the many factors that affect the length of a sentence, such as the number of murders and other crimes committed by the defendant (as mentioned); the nature and circumstances of the murder(s); whether the defendant pled guilty or went to trial; and whether the defendant cooperated with the government.  Indeed, the statistic the Court finds more relevant from the Sentencing Commission data cited by Defendant is the percentage of murder cases that resulted in life sentences, which for Fiscal Year 2024, was 20.7%—not an insignificant percentage, especially assuming that most cases do not involve defendants who have committed multiple murders. *Interactive Data Analyzer*, U.S. Sentencing Comm.

Second, Defendant compares his sentence to those of three Colombo Family members— Michael Persico, Anthony Russo, and Theodore Persico, Jr. ("Colombo defendants")—who were charged with crimes relating to mob-related violence, including the Scopo and Sparacino murders. (Def. Second Supp. Br., Dkt. 244, at 7–8.)  But these three Colombo defendants' cases are not at all comparable to Defendant's case in terms of the crimes of conviction and potential sentences those defendants faced.  None of the three comparator Colombo defendants personally carried out *four* murders; all of these defendants pled guilty pursuant to plea agreements with the government; both Persico defendants pled guilty to charges less serious than murder; and Russo, despite pleading to racketeering conspiracy with murder as a predicate act, cooperated with the government.  (*See id*. at 8 ("Michael Persico . . . plead guilty to a single count of conspiracy to engage in extortionate extension of credit" (internal citation omitted); "Theodore Persico Jr. also

25

pleaded guilty to conspiracy to murder Joseph Scopo in the aid of racketeering").)  There simply is no basis to find that these defendants were similarly situated to Defendant and that Defendant's sentence reflects an unwarranted disparity, no less a "gross disparity," from the other three Colombo defendants' sentences.  Indeed, each of the other Colombo defendants received meaningful sentences for less serious offenses than Defendant's and, in Anthony Russo's case, despite cooperating with the government.  (*Id.* (noting that Michael Persico was sentenced to five years for conspiracy to engage in extortionate extension of credit; Anthony Russo was sentenced to 33 months for racketeering conspiracy after cooperating; and Theodore Persico, Jr. was sentenced to 10 years for the Scopo murder conspiracy).)

Third, Defendant points to several cases involving multiple murders where compassionate release was granted.  (Def. First Supp. Br., Dkt. 243, at 1–2.)  Of these, the Court finds that only *United States v. Tellier*, No. 92-CR-0869 (LGS), 2023 WL 5498909 (S.D.N.Y. Aug. 25, 2023), warrants discussion.[19]  In *Tellier*, the district court reduced the defendant's multiple life sentences to time-served despite the defendant having committed four murders and an attempted murder. 2023 WL 5498909, at *1, *7.  The two defendants in *Tellier* were brothers who were part of a violent crime organization known as the "Tellier Organization" for over a decade.  *Id.* at *1.  The brother who led the organization, Robin, was assisted by his brother, Rene.  *Id.* at *3 n.4.  Rene personally committed four murders at the age of 27 and an attempted murder and was involved in

---

[19] The Court does not find the severity of the conduct involved in the other two cases cited by Defendant—*United States v. Cheng*, 678 F. Supp. 3d 312, 314 (E.D.N.Y. 2023) and *United States v. Moses*, No. 02-CR-0410-2 (CCB), 2023 WL 4421569 (D. Md., July 10, 2023)—to be comparable to Defendant's conduct.  In *Cheng*, Cheng was the driver for "three brutal planned murders" committed by fellow gang members; although Cheng himself committed two armed robberies and raped one of the robbery victims, he did not personally commit four murders.  *Cheng*, 678 F. Supp. 3d at 314.  In *Moses*, Moses participated in escalating crimes of violence, including a drug-related altercation in which Moses killed a member of an opposing gang and solicited the murder of a potential government witness.  *Moses*, 2023 WL 4421569, at *1.

numerous smash and grab robberies where a car was driven through the store window. *Id.* at *1, *5. While incarcerated, Rene Tellier "dedicated thousands of hours to helping others in prison" "[a]s a 'jailhouse lawyer.'" *Id.* at *4. In that role, he "assisted over 300 inmates in their cases" and designed and taught a course on legal writing. *Id.* Over 30 letters were supplied to the court in support of his release. *Id.* And, like Defendant here, Rene Tellier completed the "Challenge Program." *Id.* at *3. Noting that Rene Tellier was "a productive and compassionate inmate . . . committed to personal growth and serving his community" who "ha[d] not engaged in a single act of violence since [his] incarcerat[ion]," *id.* at *6, the court granted his motion for compassionate release, despite the severity of his crimes, *id.* at *7. At that point, Rene Tellier had been incarcerated for almost 34 years.[20]

While the facts of Rene Tellier's and Defendant's cases are indeed similar, there remains at least one important difference between the two cases. In *Tellier*, the district court found that:

> Defendant is not the same person he was thirty-six years ago. The difference between the two halves could not be more pronounced. Defendant has, as he describes, "made a conscientious choice to make up for [his] past sins and to live differently." He by all accounts has been a manifestly model inmate, a mentor to countless young men in custody, and an active and devoted father and grandfather, all while under the specter of a life-without-parole sentence. Defendant is now sixty-three years old, suffers from a serious, chronic heart condition and is deeply remorseful for his very serious offenses.

2023 WL 5498909, at *5.

Here, by contrast, as discussed *supra*, the Court is not convinced that Defendant "is not the same person he was [25] years ago" or that he is "deeply remorseful for his very serious offenses." Defendant also is fortunate not to suffer from any serious, chronic health issues that might justify

---

[20] A court in the Southern District of New York had indicated it would grant Robin Tellier compassionate release the year before, if the Second Circuit gave it back the jurisdiction to do so. *See United States v. Tellier*, No. 92-CR-0869 (LGS), 2022 WL 1468381, at *1 (S.D.N.Y. May 10, 2022).

early release. The Court, therefore, does not find that the sentence reduction granted in *Tellier* shows that a life sentence in this case amounts to an unwarranted disparity between similarly situated defendants.[21]

Speaking more broadly, while the Court should consider the outcomes in similar cases in applying Section 3553(a)(6), the mere fact that one judge decides to grant compassionate release, even in a case involving comparable facts and circumstances, does not dictate that another court must, or even should, do the same. As the Court said earlier, both sides will always be able to marshal decisions supporting their position with respect to unwarranted sentencing disparities but, in reality, it is virtually impossible for the Court to know whether the circumstances of any particular case are truly comparable to the one before it, given the many considerations that go into every sentencing decision, and because only the presiding judge can determine the genuineness of any defendant's claim of remorse or any other relevant fact for sentencing. For example, in *United States v. Giattino*, No. 23-6918-CR, 2024 WL 4579342 (2d Cir. Oct. 25, 2024) (summary order), *cert. denied*, No. 24-6803, 2025 WL 1151330 (U.S. Apr. 21, 2025), a case involving two organized-crime-related murders, the Second Circuit affirmed the district court's denial of compassionate release, explaining that:

> We find no abuse of discretion in the District Court's decision. "[A] district court's reasonable evaluation of the Section 3553(a) factors is an alternative and independent basis for denial of compassionate release." *United States v. Jones*, 17 F.4th 371, 374 (2d Cir. 2021) (per curiam) (citation and quotation marks omitted). We therefore need not reach the question of whether [defendant] presented extraordinary and compelling circumstances; we affirm based on the District Court's more than "reasonable evaluation of the Section 3553(a) factors." *Id.* (citation and quotation marks omitted). The District Court acted well within its

---

[21] The other difference is that, even after resentencing, Tellier served a term that is longer than the time that Defendant has served thus far. *See id.* at *4 (resentencing Tellier to the "almost 35 years" already served). The Court also notes that it is unclear whether any of the murders committed by Rene Tellier involved depraved or sadistic conduct that is comparable to Defendant's treatment of Rivera and Sparacino. *Id.* at *5.

> broad discretion in denying [defendant's] motion for compassionate release based on the [S]ection 3553(a) sentencing factors. The District Court appropriately considered "the nature and seriousness of Giattino's offenses," including "two heinous murders . . . committed in horrific manners"; the need for the sentence to reflect "the seriousness of the offense[s], promote[] respect for the law, and provide[] just punishment for the offense[s]"; and the need to avoid unwarranted sentencing disparities. *Giattino*, 2023 WL 4867564, at *4 (citations and quotation marks omitted).

*Giattino*, 2024 WL 4579342 at *2. *Giattino* is certainly as apt a comparator to this case as *Tellier*.

Thus, no one case is dispositive on whether a particular sentence constitutes an unwarranted sentencing disparity for purposes of Section 3553(a)(6). Here, based on its survey of similar defendants and cases, the Court finds that a life sentence would not result in an unwarranted sentencing disparity.

## CONCLUSION

For the above reasons, the Court denies Defendant John Pappa's motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: May 30, 2025
Brooklyn, New York